**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:23-cv-24819-DPG

ELI M. BLATT,

      Plaintiff,

v.

MARC J. GOLDNER, RACHEL KORSEN,
SIMON DIVILOV, and THE DHARMA
INITIATIVE, LLC,

      Defendants.

_____/

**REPORT AND RECOMMENDATIONS**

      **THIS CAUSE** comes before the Court upon Defendants' Memorandum of Law in Support of their Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(6), 12(b)(7), and 19 ("Motion"). (ECF No. 37). Plaintiff responded to Defendants' Motion (ECF No. 51), to which Defendants replied (ECF No. 57).[1]  Having carefully considered the Motion, Response, Reply, the record, and being otherwise duly advised on the matter, the undersigned recommends that the Motion be **GRANTED, in part**, and **DENIED, in part**.

## I.   BACKGROUND[2]

      This case arises from a soured business relationship and friendship. Plaintiff, Eli Blatt, is a serial entrepreneur and alternative asset investor. (ECF No. 30 at ¶ 16). Defendant Marc J. Goldner, together with Defendants Rachel Korsen and Simon Divilov, organized Defendant, the Dharma

---

[1] This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(A), by the Honorable Darrin P. Gayles for report and recommendation on dispositive motions. (ECF No. 29).

[2] The facts are derived from Plaintiff's Amended Complaint (ECF No. 30). On a motion to dismiss, the complaint is construed in the light most favorable to the non-moving party, and all facts alleged by the non-moving party are accepted as true. *Perlman v. Bank of Am., N.A.*, No. 11-80331-CV, 2011 WL 13108060, at *4 (S.D. Fla. Dec. 22, 2011).

1

Initiative, LLC ("Dharma") to service cryptocurrency miners belonging to themselves and others for a fee. (*Id.* at ¶ 21).  Goldner served as Dharma's managing member. (*Id.*).

Plaintiff and Goldner met as classmates in an MBA program. (*Id.* at ¶ 17). Goldner represented that he was in the business of buying and selling cryptocurrency, in addition to working as a spy to various unnamed government agencies. (*Id.* at ¶ 28). Goldner proposed that Plaintiff join him to hold and invest in digital assets, including cryptocurrency miners and non-fungible tokens ("NFTs"). (*Id.* at ¶ 20). Together, they started Goldner Blatt Investments, LLC ("GBI"). (*Id.* at ¶ 10).[3]

Korsen and Divilov participated in a WhatsApp group chat with Plaintiff and Goldner ("the WhatsApp chat") where the group discussed bitcoin mining. (*Id.* at ¶ 26).  Plaintiff and Goldner also discussed GBI's bitcoin mining aspirations with Korsen and Divilov through the WhatsApp chat. (*Id.* at ¶ 27).

In December 2021, Plaintiff and Goldner executed GBI's Operating Agreement, designating them as equal members. (*Id.* at ¶¶ 30–32). The Operating Agreement[4] provides that title to all company property will remain in the name of the company and that no member will have any ownership interest in company property. (*Id.* at ¶ 32). The Operating Agreement also prohibited GBI members from commingling its assets with those of other persons or entities, and imputed duties of care and loyalty upon its members. (*Id.* at ¶ 33).

Leading up to the parties executing the Operating Agreement, Goldner represented to Plaintiff that he had a variety of business prospects, including meeting prospects with former White

---

[3] Goldner also represented that Plaintiff would receive membership interests in Dharma as consideration for Plaintiff's monetary and time commitment to GBI. (*Id.* at ¶ 22).  However, Plaintiff alleges that he never executed Dharma's operating agreement and is not a signatory to any of its governing documents, as Plaintiff alleges that Goldner ultimately never followed through on this promise. (*Id.* at ¶¶ 23–24).
[4] Attached to the Amended Complaint as Exhibit A. (ECF No. 30-1).

House secretary and hedge fund manager Anthony Scaramucci, Shark Tank Investor Kevin O'Leary, and Apple Co-founder Steve Wozniak. Goldner represented that he could secure discounts for purchasing miners, and that he would forgo law school in order to commit time to GBI. (*Id.* at ¶ 28).[5]

After Plaintiff executed the Operating Agreement, Goldner proposed that GBI launch an NFT fund through which they would raise money from investors to purchase NFTs. (*Id.* at ¶ 35). Goldner represented that GBI would hold the NFTs until it could sell them to the NFT fund which would then hold the NFTs for at least three years. (*Id.* at ¶ 38).[6] Plaintiff sent two wires of $100,000 each directly to Goldner to purchase the NFTs for GBI, but not before memorializing Goldner's representations in an email to Goldner. (*Id.* at ¶¶ 39–40).[7] There, Blatt documented that Goldner affirmed he would use the first wire to pay for Plaintiff's in-kind contribution to GBI in the form of the NFTs and then formally assign the NFTs to GBI. (*Id.* at ¶ 41).

The NFT funds were also documented on a spreadsheet where the GBI members tracked their respective capital contributions. (*Id.* at ¶ 43).[8] Plaintiff also alleges Goldner misrepresented the value of the cryptocurrency, Ethereum, which Goldner paid towards the NFTs in GBI's spreadsheet ("the Spreadsheet"). (*Id.* at ¶ 45).

Goldner never assigned the NFTs to GBI. (*Id.* at ¶ 46). Nor did Goldner create a wallet to store the NFTs for GBI's use and benefit. (*Id.* at ¶ 47). Rather, Goldner stored the NFTs in his personal wallets, titled them in his name, and commingled them with his own assets. (*Id.* at ¶ 48). Specifically, Goldner transferred the NFTs from his cold storage hardware wallet to his hot wallet; these transfers gave Goldner exclusive use and benefit of the NFTs, including gaining access to

---

[5] Plaintiff labels these representations as the "Operating Agreement Representations." (*Id.* at ¶ 28).
[6] Plaintiff labels these representations as the "NFT Representations." (*Id.* at ¶ 39).
[7] Attached to the Amended Complaint as Exhibit "B." (ECF No. 30-2).
[8] Attached to the Amended Complaint as Exhibit "C." (ECF No. 30-3).

special discord chats and invitations to events associated with the NFTs. (*Id.* at ¶¶ 49–50). Meanwhile, neither Plaintiff nor GBI had access or title to the NFTs or their perks. (*Id.* at ¶ 51).

In late December 2021, Goldner encouraged Plaintiff to join him in purchasing bitcoin miners from a vendor, Compass Mining, LLC, ("Compass") for GBI with a plan to lease them out for profit; Goldner represented he could purchase miners from Compass at a heavy discount (despite Compass only offering Goldner its standard price for a single bundle of six miners). (*Id.* at ¶¶ 52–54). Plaintiff drafted a miner lease and servicing agreement stating that GBI would own the miners and subsequently lease them to third parties, which Goldner reviewed and never disputed. (*Id.* at ¶¶ 55–56). Instead, Goldner affirmed to Plaintiff in the WhatsApp chat that he and Plaintiff would be "doing" three bundles. (*Id.* at ¶ 57). Goldner sent Korsen, Divilov, and Plaintiff screenshots of Compass' invoices from the miners showing only the amount due but not who was invoiced. (*Id.* at ¶ 58). Plaintiff sent Compass two wires totaling $131,931.00 to purchase the initial bundles of miners for GBI, identified in the Complaint as the "First Bundle Purchase." (*Id.* at ¶ 59).

Thereafter Goldner claimed that he persuaded Compass to sell him one more bundle and asked Plaintiff if he would want to split it three ways amongst himself, Plaintiff, and Korsen, or split the bundle fifty-fifty between Plaintiff and Goldner. (*Id.* at ¶¶ 60–61). Plaintiff suggested that the GBI members should keep the equity consistent amongst them, to which Goldner proposed that three miners be owned by Dharma and three be owned by GBI. (*Id.* at ¶ 62). Goldner affirmed in the WhatsApp chat that Dharma has three bundles, GBI will have three bundles, and that Goldner and Plaintiff would split fifty-fifty all GBI miners. (*Id.* at ¶ 63). Plaintiff responded that due to GBI's ownership of the miners and subsequent contracts with Lessees, GBI would not need Dharma for this deal. (*Id.* at ¶ 65). Goldner never refuted or objected to Plaintiff's communications,

and Plaintiff wired another $20,000 to Goldner as an intended capital contribution to GBI to purchase the additional bundle from Compass. (*Id.* at ¶¶ 65–66). Following the wire, Plaintiff forwarded Goldner a revised Miner Lease Agreement, which again affirmed that GBI would own the miners and would lease them to third parties for a fee. (*Id.* at ¶ 67). Goldner replied to the agreement with only a comment on its fee structure, but never objected to GBI's ownership interests. (*Id.* at ¶¶ 68–69). Plaintiff wired Compass an additional $70,217.55 to purchase miners for GBI. (*Id.* at ¶ 71). In total, Defendant wired $222,148.55 to purchase the miners for GBI, all logged on the GBI Spreadsheet. (*Id.* at ¶¶ 72–73).

However, Goldner and Dharma used and stored the miners in an account exclusively accessed and managed by Goldner, commingling them with other miners. (*Id.* at ¶¶ 75–76). Goldner never granted Plaintiff or GBI access to, use of, or title to the miners. (*Id.* at ¶ 77).

When the cryptocurrency market took a significant downturn in May of 2022, the GBI Members agreed that the cryptocurrency market would likely continue to decrease significantly. (*Id.* at ¶ 78). When Plaintiff called for GBI to sell the NFTs, Goldner refused, saying "sue me, Eli, I'm not selling." (*Id.* at ¶ 82). Plaintiff realized then that Goldner never titled, assigned, or stored the NFTs in GBI's name. (*Id.* at ¶ 83).

As for the miners, Goldner never granted Plaintiff or GBI access, control, or visibility over the miners thereby preventing Plaintiff from gaining any direct or independent knowledge as to the miners' status; Plaintiff was unable to confirm if Goldner even purchased the miners or if Compass ever delivered them. (*Id.* at ¶¶ 84–85). Meanwhile, Goldner has vacillated between claiming that he or Dharma owned most, if not all, of the miners. (*Id.* at ¶ 86).

Plaintiff's relationship with Goldner and the other Defendants broke down. Dharma and Goldner demanded that Plaintiff pre-pay five years of hosting fees for the miners. (*Id.* at ¶ 95). In

return, Plaintiff demanded that Goldner and Dharma transfer him the miners and place the NFTs in a shared wallet. (*Id.* at ¶ 97). Goldner and Dharma responded by demanding that Plaintiff personally pre-pay Dharma monies for balances Dharma may owe on the miners in the future; hold the NFTs in a Special Purpose Vehicle that would pay fees to another of Korsen and Goldner's companies; and reimburse Goldner for his travel expenses.  (*Id.* at ¶¶ 98–99).

Then, on December 31, 2022, Divilov in his capacity as a member of Dharma sent Plaintiff a Notice of Default. (*Id.* at ¶ 100). Plaintiff alleges that Goldner drafted the Notice, but Divilov executed it with knowledge that it contained false statements, specifically that Plaintiff was one of Dharma's members, that he was required to make capital contributions to Dharma for its miner liabilities, and that he was in material breach of an unspecified agreement. (*Id.* at ¶¶ 101–02). The Notice of Default also demanded that Plaintiff pay Dharma $140,512.50 by January 30, 2023 for the miners' alleged outstanding balance and service fees, or Dharma would pursue legal action against Plaintiff. (*Id.* at ¶ 103). The Notice of Default went on to represent that Compass had not even delivered the miners purchased with Plaintiff's miner funds. (*Id.* at ¶ 106). On January 29, 2023, Korsen emailed Plaintiff claiming that the Defendants knew money was "being sent to Dharma for 4.5 miners each and that Dharma was acquiring the miners on behalf of everyone." (*Id.* at ¶ 109); (ECF No. 30-8 at 2).[9]

Plaintiff did not acquiesce to the Notice of Default, instead serving a rescission notice for GBI's Operating Agreement upon Goldner on April 30, 2023. (ECF No. 30 at ¶ 111). Plaintiff demanded rescission of the Operating Agreement because of the GBI Members' lack of completed contributions to GBI; Plaintiff's lack of consideration of any kind for entering into the Operating Agreement; Goldner's false and misleading representations; and Goldner's repeated and habitual

---

[9] Plaintiff refers to this as the "Korsen Correspondence," and attaches it as Exhibit "H." (ECF No. 30-8).

breaches of the Operating Agreement. (*Id.* at ¶ 112). That same day, Plaintiff sent Goldner a Civil Theft Notice demanding the return of the Funds and Assets. (*Id.* at ¶ 113). Goldner has neither acknowledged Plaintiff's demand for rescission nor responded to the civil theft notice. (*Id.* at ¶ 114).

Plaintiff alleges that Goldner induced him to execute the Operating Agreement through misrepresentations, omissions, or concealments. Goldner induced Plaintiff to wire him and Compass a combined $422,148.55 to purchase bitcoin miners and non-fungible tokens. (*Id.* at ¶ 12). Instead of purchasing the assets for GBI, Goldner, acting individually and as manager of Dharma in concert with Divilov and Korsen, converted the funds to Dharma's benefit. (*Id.* at ¶ 14).

Plaintiff initiated this suit in the Eleventh Judicial Circuit Court in and for Miami-Dade County, Florida. The matter was removed to Federal Court pursuant to diversity jurisdiction.[10] While Defendants' original Motion to Dismiss was pending, Plaintiff moved for leave to amend his Complaint; his Amended Complaint followed on February 12, 2024. As to Defendant Goldner individually, Plaintiff brought eight claims: Fraudulent Inducement (Count I); Fraudulent Concealment (Count II); Equitable Fraud (Count III); Breach of Fiduciary Duties (Count IV); Rescission of Operating Agreement (Count V); Declaratory Judgment (Count VI); Unjust Enrichment for the NFTs and NFT Funds (Count VIII); and Conversion of the NFTs and NFT Funds (Count X). As to Defendants Goldner and Dharma, together Plaintiff brings three claims: Unjust Enrichment for the Miners and Miner Funds (Count IX); Conversion for the Miners and Miner Funds (Count XI); and Constructive Trust (Count XII). Finally, Plaintiff brings just one claim against Korsen and Divilov, together with Dharma: Aiding and Abetting Breach of Fiduciary

---

[10] Plaintiff is a resident of Miami-Dade County, while Defendants Goldner and Korsen are residents of Connecticut, Divilov is a resident of North Carolina, and Dharma is a Delaware Limited Liability Company. *See* (ECF No. 30 at ¶¶ 1–5).

Duties (Count VII). The Parties have stipulated that Delaware law should apply to this action. (ECF No. 36).

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a claim for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead facts sufficient to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court's consideration is limited to the allegations in the complaint. *See GSW, Inc. v. Long Cnty.*, 999 F.2d 1508, 1510 (11th Cir. 1993).  All factual allegations are accepted as true and all reasonable inferences are drawn in the plaintiff's favor.  *See Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010); *see also Roberts v. Fla. Power & Light Co.*, 146 F.3d 1305, 1307 (11th Cir. 1998).

Although a plaintiff need not provide "detailed factual allegations," a complaint must provide "more than labels and conclusions." *Twombly*, 550 U.S. at 555.  "[A] formulaic recitation of the elements of a cause of action will not do." *Id.*  Rule 12(b)(6) does not allow dismissal of a complaint because the court anticipates "actual proof of those facts is improbable" but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 545).

However, in actions sounding in fraud, a plaintiff must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  "[U]nder Rule 9(b), the Plaintiffs must allege (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the

Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997).

## III.   DISCUSSION

Defendants move to dismiss Plaintiff's Amended Complaint on the grounds that Counts I, II, and II are deficient, duplicative, and conclusory fraud claims as well as shotgun pleadings; Count VII fails to state a claim; Counts IV, V, and VI are duplicative in nature and fail to join GBI; and Plaintiff lacks standing to bring Counts VIII through XII.

### A.   Shotgun Pleading

Defendants challenge Counts I, II, and III as shotgun pleadings. Indeed, the entire Amended Complaint exhibits the characteristics of a shotgun pleading, which should be dismissed.[11] Rule 8(a) requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8(d)(1) requires that "[e]ach allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). Rule 10(b) requires a party to state its claims in numbered paragraphs, "each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). The Eleventh Circuit has provided substantial guidance on shotgun pleadings, identifying four such categories:

> Though the groupings cannot be too finely drawn, we have identified four rough types or categories of shotgun pleadings. The most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type, at least as far as our published opinions on the subject reflect, is a complaint that does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The third type of shotgun pleading is one that commits the sin of not

---

[11] "[D]istrict courts have a 'supervisory obligation,' under [Federal Rule of Civil Procedure] 12(e), to *sua sponte* direct a plaintiff to better plead his complaint 'when a shotgun complaint fails to adequately link a cause of action to its factual predicates.'" *Lampkin–Asam v. Volusia Cnty. School Bd.*, 261 Fed. App'x. 274, 277 (11th Cir. 2008) (quoting *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1275 (11th Cir. 2006)).

> separating into a different count each cause of action or claim for relief.  Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

*Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321–23 (11th Cir. 2015) (footnotes omitted).  "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 1323.  "Courts in the Eleventh Circuit have little tolerance for shotgun pleadings." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018).  A district court may dismiss a complaint as a shotgun pleading on that basis alone. *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1357 (11th Cir. 2018) (citing *Weiland*, 792 F.3d at 1320).

"The Court is not required 'to parse the complaint searching for allegations of misrepresentations that could conceivably form the basis' for Plaintiff's claims." *Great Fla. Bank v. Countrywide Home Loans, Inc.*, No. 10-22124-CIV, 2011 WL 382588, at *2 (S.D. Fla. Feb. 3, 2011) (quoting *Ferrell v. Durbin*, 311 Fed. App'x. 253, 259 (11th Cir. 2009)).

The Amended Complaint reincorporates every factual allegation (116 paragraphs in total) into each claim, when that plainly is not the case. Taking Count I as an example, the representations Plaintiff alleges induced him to enter *into* the Operating Agreement cannot be those he alleges Goldner made post-agreement, which allegedly induced him to make the challenged wire transfers. Yet, Plaintiff's fraudulent inducement claim (Count I) is premised upon the allegation that "[t]he Representations were material for Blatt to execute the Operating Agreement and ultimately wire the funds." (*Id.* at ¶ 121). Plaintiff groups together representations related to execution of the Operating Agreement and provision of funds to purchase the NFTs and the miners, collectively pled as "Representations." (ECF No. 30 at ¶ 90).

Likewise, Plaintiff's fraudulent concealment claim also incorporates every fact previously pled—including the facts pertaining to the fraudulent representations. *See* (*id.* at ¶ 125). Plaintiff alleges that "Goldner intentionally withheld this information from Blatt to induce him to execute the Operating Agreement and subsequently wire Goldner and Compass the respective Funds," (*id.* at ¶ 127), and "[t]he Representations were material for Blatt to execute the Operating Agreement and ultimately wire the Funds," (*id.* at ¶ 128). Defendants complain that the allegations fail to identify *what* Goldner concealed. In his response, Plaintiff argues that his fraudulent concealment claim "identifies what information Goldner [deliberately] concealed[,] . . . when he concealed, and what duties he derived a duty to speak from." (ECF No. 51 at 12). He supports this contention, not by citing to the fraudulent concealment claim itself, but by citing to paragraph 28 of 116 from the factual allegations, which itself is the entire list of "Operating Agreement Representations." This is the exact type of parsing the Court is not required to perform. *See Great Fla. Bank*, 2011 WL 382588, at *2.

Plaintiffs' claim for breach of fiduciary duties similarly fails to meaningfully plead the facts that he contends give rise to the duty owed and breached. By incorporating all facts previously alleged, Plaintiff purports to base the fiduciary relationship on entry into the Operating Agreement itself. Yet Plaintiff alleges that Goldner breached the duty by making fraudulent representations to induce Plaintiff into that Agreement in the first place, while concealing facts that Goldner was duty bound to disclose due to the "special" relationship formed post-Agreement. (*Id.* at ¶¶ 148, 151).

Plaintiff's non-contract claims, which are pled in the alternative—Count III for equitable fraud, Count V for rescission of Operating Agreement, Count VI for declaratory judgment, and Count XII for constructive trust—nonetheless incorporate his allegations surrounding the Operating Agreement. Plaintiff's reincorporation of every factual allegation is likewise puzzling

and, at times, paradoxical. For example, Plaintiff's claim for declaratory judgment at Count VI includes every factual allegation and adds that "the Operating Agreement is void *ab initio* as having been arranged by Goldner, *ultra vires*, in breach of his fiduciary duties, fraudulently, and in furtherance of a fraudulent scheme, and because neither of the GBI Members completed any contributions as consideration for the Operating Agreement." (ECF No. 30 at ¶ 165). The allegation that neither GBI member completed any contribution is jarring, given that the Count incorporates allegations that Plaintiff himself recorded the NFT funds and miner funds as intended contributions. *See* (*Id.* at ¶ 73) ("As with the NFT Funds, the GBI Members recorded the Miner Funds on the GBI Spreadsheet as intended in-kind capital contributions to GBI.") (citing ECF No. 30-3). Ultimately, each Count is bogged down with general allegations which, at best fail to provide clarity and, at worst, contradict that which forms the basis for a given Count.

Dismissal for failure to satisfy Rule 8 generally requires that the court afford the plaintiff leave to amend a first complaint. "When faced with a shotgun pleading, a district court must order a litigant to replead for a more definite statement of the claim." *Luft v. Citigroup Glob. Mkts. Realty Corp.*, 620 F. App'x 702, 704 (11th Cir. 2015). Accordingly, the undersigned recommends that the Court dismiss the Amended Complaint with leave to amend, and instruct Plaintiff that a second amended complaint must include only factual allegations that support each of his claims. The second amended complaint must also clearly, simply, and concisely state which allegations support each claim.

Because leave to amend is recommended, the Court further analyzes the deficiencies raised in Defendant's motion to dismiss based on Rule 12(b)(6), Rule 19(b), and Rule 9(b) as repetition of such deficiencies would again warrant dismissal. *See Fox v. Loews Corp.*, 309 F. Supp. 3d 1241, 1245 (S.D. Fla. 2018) ("Nevertheless, the Court addresses the Amended Complaint's five claims

12

and the parties' arguments in order to give Plaintiff direction on how to proceed with a final, amended pleading . . . .").

**B.       Whether GBI is a Necessary Party to Plaintiff's Claims for Breach of Fiduciary Duties, Rescission, and Declaratory Judgment (Counts IV Through VI) and Whether Plaintiff Has Standing to Bring his Claims for Unjust Enrichment, Conversion, and Constructive Trust (Counts VIII Through XII).**

Defendants move to dismiss Counts IV through VI for failure to join an indispensable party. Defendants argue that GBI is a necessary party under Federal Rule of Civil Procedure 19 to Plaintiff's claims for Breach of Fiduciary Duties (Count IV), Rescission (Count V), and Declaratory Judgment (Count VI) because GBI "has an interest in the action as Plaintiff's claims for relief will impair and impede GBI's ability to protect its interests." (ECF No. 57). Plaintiff argues that, because he and Goldner are GBI's sole members, the Court can adjudicate these claims without GBI.

Similarly, Defendants argue that Plaintiff lacks standing to bring his claims for Unjust Enrichment (Counts VIII, IX), Conversion (Counts X, XI), and a Constructive Trust (Count XII), as those claims allege an injury suffered by GBI, not Plaintiff.  Counts VIII through Count XII each require Plaintiff to have an ownership interest in the subject property, which Defendants contend he cannot show on the facts alleged, which demonstrate that GBI owns the contested assets.

Both arguments question whether the harms alleged belong to Plaintiff or to GBI. Under Federal Rule of Civil Procedure 17(a), "an action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a). Meanwhile, "[r]ule 19 states a two-part test for determining whether a party is indispensable." *Challenge Homes, Inc. v. Greater Naples Care Ctr., Inc.*, 669 F.2d 667, 669 (11th Cir. 1982). First, the court applies the standards of Rule 19(a) to determine "whether the person in question is one who should be joined if feasible." *Id.* If joinder of a required

person is not feasible because, for instance joinder would destroy jurisdiction, "then the court must inquire whether, applying the factors enumerated in Rule 19(b), the litigation may continue." *Id.*

Defendants' argument that GBI is the party injured by Defendants' actions implies that Plaintiff's claims are derivative of GBI. "There is no question that a corporation is an indispensable party in a derivative action brought by one of its shareholders." *Liddy v. Urbanek*, 707 F.2d 1222, 1224 (11th Cir. 1983). To determine whether a claim is direct or derivative "the court must determine (1) who suffered the alleged harm (the company or the suing stockholder, individually); and (2) who would receive the benefit of any recovery or other remedy (the company or the stockholder, individually)." *Arkansas Nursing Home Acquisition, LLC v. CFG Cmty. Bank*, 460 F. Supp. 3d 621, 643 (D. Md. 2020) (applying Delaware law) (internal quotations omitted).

Plaintiff argues that GBI is not a required party for the rescission and declaratory judgment claims because GBI is not a signatory to the Operating Agreement, and GBI's claims are so closely aligned with the existing parties' interest so as to not require its joinder. Defendants in their reply responded that failure to join GBI will "impede GBI's ability to protect its interests, namely recouping the money owed it pursuant to the Operating Agreement." (ECF No. 57 at 5). Defendants moreover improperly rely on facts outside the Amended Complaint to argue that Plaintiff and GBI's interests are not one and the same. (*Id.*).

In their Motion to Dismiss, Defendants advance all of two sentences to support their argument that GBI is a necessary party to the rescission and declaratory judgment claims because it "certainly has an interest in its Operating Agreement." (ECF No. 37 at 15).[12] As Plaintiff points out, Defendants have the burden "to demonstrate which Rule 19(b) factors require[] dismissal."

---

[12] Defendants include Plaintiff's claim for breach of fiduciary duties in the subsection addressing claims that should be dismissed for failure to join GBI, but advance no basis for this Court to find that GBI is a necessary party to that claim.

*Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1347 (11th Cir. 2011). Defendants have not made the necessary showing and the undersigned recommends denying the Motion to Dismiss on this basis.

With respect to standing, Defendants argue that the unjust benefit as alleged was conferred by GBI, and that Plaintiff's claims for conversion attempt "to usurp [GBI's] rights and remedies by omitting it from this action." (ECF No. 37 at 17). Plaintiff contends that he has clearly alleged that it was his funds that were misappropriated by Goldner, giving rise to his personal injury. (ECF No. 51 at 17). Defendants Reply fails to address Plaintiff's arguments or caselaw support as to standing. *See* (ECF No. 57).[13]

Plaintiff avers that Defendants' standing argument asks this Court to look outside the Amended Complaint. (ECF No. 51 at 19). For his claim of unjust enrichment for the NFTs and NFT funds, Plaintiff relies on his factual allegations, including: that Plaintiff relied on the "NFT Representations" to wire $200,000.00 "directly to Goldner to purchase the NFTs for GBI," (ECF No. 30 at ¶ 39); "Goldner never created a wallet to store the NFTs for GBI's use and benefit[,] . . . [i]nstead, Goldner stored the NFTs in wallets belonging to him" (*id.* at ¶¶ 47–48); and "[a]s of today, neither GBI nor Blatt have ever had access to or title to the NFTs as they were never transferred or assigned to GBI as represented," (*id.* at ¶ 51). Likewise for the claim of unjust enrichment of the miners and miner funds, Plaintiff alleges that he wired $222,148.55 "to purchase the Miners for GBI," (*id.* at ¶ 72); "[a]s with the NFT funds, the GBI Members recorded the Miner Funds on the GBI Spreadsheet as intended in-kind capital contributions to GBI," (*id.* at ¶ 73); and

---

[13] Defendants also argue that Plaintiff's claim for unjust enrichment is not cognizable because his claim is governed by the Operating Agreement. At this stage, Plaintiff's allegation challenging the validity of the Operating Agreement is enough to allow this claim to be pled in the alternative. *See Williams v. Wells Fargo Bank N.A.*, No. 11-21233-CIV, 2011 WL 4368980, at *11 (S.D. Fla. Sept. 19, 2011) ("unjust enrichment may only be pleaded in the alternative where one of the parties asserts that the contract governing the dispute is invalid.").

"Goldner never granted Blatt or GBI access to, use, of, or title to the Miners," (*id.* at ¶ 77). Plaintiff argues that "[t]hese allegations sufficiently show the relationship between Plaintiff's rights to the Funds, NFTs, and miners and Goldner's unjust taking and conversion of the same." (ECF No. 51 at 19).

Plaintiff has alleged facts sufficient to show that he has or had an interest in the assets, including his own funds and the purchased NFTs and miners; however, the relationship is not clearly alleged because many, if not most, of his allegations relating to the harm suffered by himself or GBI collapses the two into one, and fails to appreciate that they are separate actors (and potential plaintiffs). If afforded leave to amend, Plaintiff's allegations of harm should be specific enough to enable the Court to determine whether the injury he seeks to redress is his own, or whether GBI's interests make it indispensable to this suit.

**C.     Plaintiff Has Not Stated a Claim for Aiding and Abetting a Breach of Fiduciary Duties (Count VII).**

As recounted above, Plaintiff alleges that Goldner owed duties of care and loyalty to Blatt, as the other member of GBI, which Plaintiff alleges required Goldner to refrain from making false representations. In Plaintiff's breach of fiduciary duties claim (Count IV), Plaintiff further alleges that Goldner engaged in "egregious misconduct" that breached his fiduciary duty to Plaintiff by demanding that Plaintiff pay Dharma and Goldner for the miners; inflating the value of the Ethereum logged on the GBI Spreadsheet; and refusing Plaintiff's call to force a sale of the NFTs. (ECF No. 30 at ¶¶ 147–48). Plaintiff's aiding and abetting claim against Dharma, Korsen, Divilov is premised on Goldner's alleged demand that Plaintiff pay Goldner and Dharma for the miners. (*Id.* at ¶ 172).

Plaintiff alleges that the Individual Defendants and Dharma were aware of Goldner's fiduciary duties to Plaintiff, specifically, his duty "not to act in a manner that benefitted him to the

exclusion of Blatt." (*Id.* at ¶ 170). Plaintiff alleges that Dharma, Korsen and Divilov knowingly participated in Goldner's demands by sending Plaintiff the correspondence relating to his purported default. (*Id.* at ¶ 173). In sum, Plaintiff alleges that the individuals sent him the default correspondence despite knowing, or deliberately ignoring, Goldner's misrepresentations about the miners. (*Id.* at ¶ 176).

"The elements of aiding and abetting a breach of fiduciary duty are: '(i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach.'" *In re Oracle Corp. Derivative Litig.,* No. CV 2017-0337-SG, 2020 WL 3410745, at *10 (Del. Ch. June 22, 2020) (quoting *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015)). "To withstand a motion to dismiss, a plaintiff must plead facts making it reasonably conceivable that the defendant knowingly supported a breach of duty *and* that his resulting assistance to the primary actor constituted substantial assistance in causing the breach." *In re Oracle Corp. Derivative Litig.*, 2020 WL 3410745, at *11 (emphasis in original). The "knowing participation" element requires Plaintiff to "plead facts from which it reasonably can be inferred that the defendants knew or were in a position to know of the underlying tortious conduct. For substantial assistance, the plaintiff must show the abettor's encouragement or assistance [wa]s a substantial factor in causing the resulting tort." *Yangaroo Inc. v. Digital Media Servs., Inc.*, No. N23C-06-090 EMD CCLD, 2024 WL 2791100, at *10 (Del. Super. Ct. May 30, 2024) (internal quotations and footnotes omitted) (alteration in original).

Defendants argue that Plaintiff failed to allege that Dharma, Divilov, and Korsen knowingly participated in the breach of fiduciary duties and that it is unclear what it means to have knowingly participated in "Goldner's repeated demands." (ECF No. 37 at 14). Plaintiff relies on

the WhatsApp chat where Goldner represented that "Dharma has 3 bundles. GBI will have 3 bundles," (ECF No. 30 at ¶ 63) for the proposition that the Individual Defendants knew of GBI or Plaintiff's interests in the miners. *See* (ECF No. 51 at 15). Plaintiff contends that, despite this knowledge, "Korsen, Dharma, and Divilov actively and directly represented to Plaintiff that he and GBI have no right to the Miners" and thereby "facilitate[ed] the conveyance of mispresented, inaccurate information and assist[ed] in the fraud perpetuated upon Plaintiff." (*Id.*).

While Plaintiff's allegations and argument may support an inference that the Individual Defendants had knowledge of GBI's interest in the miners, his allegations stop short of alleging participation in a breach of any fiduciary duty. Plaintiff's reliance on *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 990 (Del. Ch. 2000) is misplaced but instructive. First, the court there considered whether plaintiff had pled facts sufficient to state a claim for breach of fiduciary duty, arising from an allegation of misleading representations made to shareholders in a proxy statement regarding a potential merger. Finding the claim adequately pled, the court then considered whether plaintiff had pled sufficient facts to allege the various non-fiduciary defendants had aided and abetted in that breach: it reached different conclusions with respect to different actors, dismissing those defendants whose alleged knowledge was merely imputed on them by plaintiff; claims were permitted to stand against those defendants that plaintiff alleged had actual knowledge of the fiduciaries alleged misconduct. *Id.* at 990–91.

Plaintiff here does not base his aiding and abetting claim on a misrepresentation or omission made in relation to the LLC of which he is a member; rather, he alleges that his business partner pursued another business interest and falsely represented that Plaintiff owed money to that business. This does not allege conduct that, on its face, is inherently wrongful. "A court may infer a non-fiduciary's knowing participation only if a fiduciary breaches its duty in an inherently

18

wrongful manner, and the plaintiff alleges specific facts from which that court could reasonably infer knowledge of the breach." *Crescent/Mach I Prtners,* 846 A.2d at 990.

Notably missing from Plaintiff's aiding and abetting claim is any fact to support the individual's "degree of scienter" with which Plaintiff alleges the Individual Defendants acted in perpetuating a fraud upon him. For example, he argues in Response to the Motion that the Individual Defendants "actively and directly represented to Plaintiff that he and GBI have no right to the Miners and thereby assisted Goldner" in conveying inaccurate information to Plaintiff. (ECF No. 51 at 15). Yet the facts alleged in the Amended Complaint reveal that the Individual Defendants had the same basis for knowing the truth or falsity of those statements as Plaintiff: messages in the WhatsApp chat, where he and Goldner discussed investments. No facts are pled that would support Plaintiff's characterization of the Individual Defendant's knowledge that the correspondences were perpetuating a fraud on him.

Plaintiff also relies on *In re American Business Financial Services, Inc.* as a case where an aiding-and-abetting claim survived dismissal because the court inferred encouragement and assistance in a breach despite the third-party not directly participating in the fiduciary's main wrongdoing. (ECF No. 51 at 14) (citing *In re Am. Bus. Fin. Servs., Inc.*, 375 B.R. 112, 117 (Bankr. D. Del. 2007)). However, in that case the third-party was alleged to have withheld information regarding the fiduciary's breach and embedded himself in the plaintiff-trustee's confidence without disclosing a conflict of interest with the fiduciary, resulting in devaluation and waste of the plaintiff-trustee's assets before their sale. The court *In re American Business Financial Services, Inc.* reasoned that, while the third-party may not have directly participated in the ultimate sale comprising the breach, there were sufficient facts to infer that the third-party substantially participated in the breach leading up to the sale. *Id.* at 118.

Here, Plaintiff may allege knowledge of his or GBI's ownership interests in certain miners through the WhatsApp chat, but the Complaint lacks facts from which the Court can infer assistance towards causing a breach of fiduciary duty. *See, e.g., Yangaroo Inc.*, 2024 WL 2791100, at *11 (denying motion to dismiss claim for aiding and abetting fraud where plaintiff alleged that moving defendants encouraged concealment leading up to fraud claims). Plaintiff fails to allege a breach that the Individual Defendants played a substantial role in causing.

Accordingly, Plaintiff's claim against the Individual Defendants for aiding and abetting Goldner's breach of fiduciary duty should be dismissed for failure to state a claim.

**D.      Plaintiff's Claims for Fraudulent Inducement (Counts I), Fraudulent Concealment (Count II), and Equitable Fraud (Count III) Fail to Meet Rule 9(b)'s Heightened Pleading Standard for Fraud Claims.**

Defendants argue that Plaintiff's claims for fraudulent inducement, fraudulent concealment, and equitable fraud fail to state a claim under the heightened pleading standard of Federal Rule of Civil Procedure 9(b).[14] Plaintiff responds that he has alleged requisite facts to meet the 9(b) standard and claims that further specificity is not required because the details are solely within Goldner's control.

Under Rule 9(b), the Complaint must state:

(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

---

[14] To the extent Defendants argue that claims I through III are duplicative of one another, the Court notes that the claims have their own distinct legal standards and should not be considered duplicative at this stage of the litigation. *See Appleby v. Knauf Gips KG*, No. 22-CIV-61411-RAR, 2023 WL 3844770, at *2 (S.D. Fla. June 5, 2023) ("Claims are duplicative when they rely on identical allegations, are decided under the same legal standard, and provide identical relief.").

*Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007) (internal quotations omitted). This heightened pleading standard goes towards the purpose of alleging the elements of fraud:

> 1) a false representation, usually one of fact . . . ; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance.

*Hauspie v. Stonington Partners, Inc.*, 945 A.2d 584, 586 (Del. 2008) (quotations and footnote omitted).

The Court agrees that Plaintiff's claims fail to meet the heightened standard of Federal Rule of Civil Procedure 9(b). Plaintiff must identify the "who, what, when, where, and how of the fraud." *Ceithaml v. Celebrity Cruises, Inc.*, 207 F. Supp. 3d 1345, 1353 (S.D. Fla. 2016) (internal quotations omitted).

As noted above, Count I realleges all preceding paragraphs. Thus, the "Representations" on which Plaintiff bases his claim for inducement into the Operating Agreement include post Agreement allegations. Plus, the same facts alleged to support his claim for fraudulent inducement are the facts which allegedly support his concealment claim. Beyond the superfluous and immaterial allegations, Count I fails to set out what the Representations were, when or where they were made, and how Plaintiff relied upon them outside of ambiguities alleged in the collective. *See, e.g.* (ECF No. 30 at ¶ 118) ("Goldner made the Representations with knowledge of the Falsities and with the intent to defraud Blatt and improperly benefit financially therefrom."); (*id.* at ¶ 122) ("When Goldner made the Representations with knowledge of the Falsities, Blatt was unaware of the facts that Goldner misrepresented and concealed from him."). Additionally, to the extent Plaintiff relies on the collective "Representations" for any of his fraud claims, the factual

21

allegations incorporated in each claim is equally lacking allegations regarding the "time and place of each such statement." *Tello*, 494 F.3d at 972. For example, the collective "Operating Agreement Representation" consists of a list of 15 representations alleged to have been made between October 2021 and December 2021, without any further specificity of time, place, or manner of the representation. (ECF No. 30 at ¶ 28).  Plaintiff's claim for fraudulent inducement should be dismissed without prejudice with leave to amend to meet the heightened pleading standard required of claims sounding in fraud.

Plaintiff's claim for equitable fraud at Count III fails alongside his claim for common law fraud. "[T]he only departure from the common law elements [of fraud is the Court's] willingness to provide a remedy for negligent or innocent misrepresentations: the defendant did not have to know or believe that his statement was false or to have proceeded in reckless disregard of the truth." *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983). Plaintiff sets out equally vague allegations in his equitable fraud claim while attempting to plead a negligence standard. Without specificity regarding the fraud at issue here, Plaintiff's claim for equitable fraud is due to be dismissed.

Count II for fraudulent concealment likewise fails to meet the heightened pleading standard. Under Delaware law, the elements of fraudulent concealment, or intentional misrepresentation, are "(1) deliberate concealment by the defendant of a material past or present fact, or silence in the face of a duty to speak; (2) that the defendant acted with scienter; (3) an intent to induce plaintiff's reliance upon the concealment; (4) causation; and (5) damages resulting from the concealment." *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987).

Plaintiff alleges that Goldner deliberately concealed material facts related to the Operating Agreement, Assets, and Funds including that Goldner "never intended to title any of the Assets in

GBI's name;" that he "never intended to make any capital contributions to GBI;" that the price Goldner received for the miners was not at a heavy discount; that "Goldner and/or Dharma, and not GBI, would own and have access to the miners;" and "the Representations were false." (ECF No. 30 at ¶ 126). Again, Plaintiff fails to set out with the requisite precision where these representations were made and the content of these statements. *See Tello*, 494 F.3d at 972.  Also, by grouping together the Operating Agreement, Funds, and Assets, the Amended Complaint fails to identify precisely what the consequences of the given misrepresentations were.

Plaintiff argues that he should be excused from 9(b)'s heightened pleading standard because Goldner never granted Defendant access to the NFTs or the miners. Plaintiff's reliance on *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) for the proposition that he need not plead facts in Defendants' possession is misplaced on two grounds. *See* (ECF No. 51 at 9).  In *Kraftsow*, the Third Circuit recognized that even under a flexible application of Rule 9(b), "[p]laintiffs must accompany their allegations with facts indicating why the charges against defendants are not baseless and why additional information lies exclusively within defendants' control." *Kraftsow*, 890 F.2d at 645. However, Plaintiff does not allege in his Amended Complaint *why* the "who, what, when, and where" of the representations lie exclusively within Defendants' control.

Moreover, the pleading leniency he seeks would at most apply to his ability to allege facts supporting his contention that the Representations were knowingly and falsely made—facts that may indeed be within Defendants' exclusive possession. This does not excuse him from alleging specificity with respect to the representations made to him. Based on the current allegations, the "who, what, when, where, and how" of the fraud on these facts seem to be available via Plaintiff's own recollection or records. *See also Crescent/Mach I Partners, L.P.*, 846 A.2d at 988–89

("plaintiffs' suggestion that their allegations cannot be fully articulated in the absence of discovery belies the fraud-based pleading standard. I know of no Delaware precedent that permits a conclusory allegation to proceed on the basis that later discovery will fill in the purported gaps if only the pleading is allowed to survive a motion to dismiss.").

Therefore, Counts I, II, and III should be dismissed.

## IV.    RECOMMENDATIONS

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that Defendants' Motion to Dismiss (ECF No. 37) be **GRANTED, in part,** and **DENIED, in part,** and Plaintiff's Amended Complaint should be dismissed, without prejudice.  A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Darrin P. Gayles, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) days** of being served with a copy of this Report and Recommendation.  Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191–92 (11th Cir. 2020).

Any response to objections must be filed within **seven (7) days** of the filed objections. *See* S.D. Fla. L.R. 4(b).

**RESPECTFULLY SUBMITTED** in Chambers, in Miami, Florida this 21st day of August, 2024.

LAUREN F. LOUIS
UNITED STATES MAGISTRATE JUDGE