UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-24819-CIV-GAYLES/D'ANGELO

ELI M. BLATT,
**individually and derivatively
on behalf of GOLDNER BLATT
INVESTMENTS, LLC,**

      **Plaintiff,**

**vs.**

**MARC J. GOLDNER, RACHEL
KORSEN, SIMON DIVILOV, and
THE DHARMA INITIATIVE, LLC,**

      **Defendants.**

_____/

## OMNIBUS REPORT AND RECOMMENDATION

**THIS CAUSE** is before the Court on Defendants The Dharma Initiative, LLC, Marc J. Goldner, Rachel Korsen, and Simon Divilov's Motion to Dismiss the Second Amended Complaint with Prejudice filed on November 7, 2024 (DE 72).[1]  Plaintiff Eli M. Blatt filed his response on December 2, 2024 (DE 76), and Defendants replied on December 9, 2024 (DE 78).  On August 4, 2025, the Court heard oral arguments on Defendants' Motion to Dismiss the Second Amended Complaint (DE 200).  Also before the Court are various Motions to Dismiss Defendants' Counterclaim and Third-Party Complaint: (1) Third Party Defendant MegaCap Capital LLC filed its Motion to Dismiss on March 28, 2025 (DE 98).  Defendants filed their response on April 11, 2025 (DE 107), and MegaCap Capital LLC replied on April 18, 2025 (DE 114).  (2) Plaintiff Eli M. Blatt filed his Motion to Dismiss on March 28, 2025 (DE 99).  Defendants responded in opposition on April 11, 2025 (DE 106), and Blatt replied on April 18, 2025 (DE 113).  (3) Third-

---

[1] This case was referred to the undersigned Magistrate Judge for a ruling on all pre-trial, non-dispositive matters and for a Report and Recommendation on all dispositive matters (DE 138).

Party Defendant BitSource LLC filed its Motion to Dismiss on April 23, 2025 (DE 117).  Third-Party Plaintiff Marc J. Goldner responded in opposition on May 7, 2025 (DE 135), and BitSource LLC replied on May 15, 2025 (DE 146).  (4) Third-Party Defendants Megacap Funds, LP - Tech Holding and Megacap Funds, LP - Tech I's filed their Motion to Dismiss on April 23, 2025 (DE 118).  Third-Party Plaintiff Marc J. Goldner responded in opposition on May 7, 2025 (DE 134), and Megacap Funds, LP - Tech Holding and Megacap Funds, LP - Tech I replied on May 15, 2025 (DE 146).  (5) Third-Party Defendant Wayaca LLC filed its Motion to Dismiss on April 23, 2025 (DE 119).  Third-Party Plaintiff Marc J. Goldner responded in opposition on May 7, 2025 (DE 136), and Wayaca LLC replied on May 15, 2025 (DE 146).  (6) Third-Party Defendant Bank of America Corporation filed its Motion to Dismiss on April 28, 2025 (DE 126).  Third-Party Plaintiff Marc J. Goldner responded in opposition on May 12, 2025 (DE 126), and Bank of America Corporation replied on May 29, 2025 (DE 164).  (7) Third-Party Defendant Michael Elkins filed his Motion to Dismiss on May 11, 2025 (DE 143).  Third-Party Plaintiff Marc J. Goldner responded in opposition on May 27, 2025 (DE 157), and Michael Elkins replied on June 13, 2025 (DE 177).  (8) Third-Party Defendant JPMorgan Chase Bank, N.A. filed its Motion to Dismiss on May 19, 2025 (DE 147).  On June 2, 2025, Third-Party Plaintiff Marc J. Goldner responded in opposition (DE 172), and JP Morgan Chase Bank, N.A. replied on June 16, 2025 (DE 178).  (9) Third-Party Defendant Flow, Inc. filed its Motion to Dismiss on June 17, 2025 (DE 182).  Third-Party Plaintiff Marc J. Goldner responded in opposition on July 21, 2025 (DE 192), and Flow, Inc. replied on July 28, 2025 (DE 198).[2]  Additionally, the Parties submitted supplemental briefing addressing issues concerning Defendants' Counterclaim and Third-Party Complaint (DE 159, 165,

---

[2] Upon Third-Party Plaintiff's Notice of Dismissal With Prejudice (DE 188), the Court dismissed Third-Party Defendants Little Prince Equity, LLC and Thibaut Denonain with prejudice on July 21, 2025 (DE 190).

166, 167, 168, 169).  On March 12, 2025, Goldner filed his Motion for a Temporary Restraining

Order and Preliminary Injunction against Plaintiff (DE 93).  On April 15, 2025, Plaintiff responded

in opposition (DE 108), and Goldner replied on April 22, 2025 (DE 115).  Having considered the

Parties' arguments in the briefing and at the August 4, 2025 hearing, the relevant legal authorities,

and the pertinent portions of the record, and being otherwise fully advised in the premises, for the

reasons stated below, it is respectfully recommended that Defendants' Motion to Dismiss the

Second Amended Complaint (DE 72) be **GRANTED**.  It is further respectfully recommended that

all claims against Third-Party Defendants in the Third-Party Complaint be **DISMISSED**

**WITHOUT PREJUDICE**.   It is further respectfully recommended that Defendants'

Counterclaims (DE 81) be **STRICKEN**.  It is further respectfully recommended that Defendant

Goldner's Motion for a Temporary Restraining Order and Preliminary Injunction (DE 93) be

**DENIED WITHOUT PREJUDICE**.

## I.   BACKGROUND

### A.   Factual Background

This case has a complicated history.  In a Report and Recommendation dated August 21,

2024, the Court previously set forth in great detail the allegations surrounding the Parties' dispute

as described in the Amended Complaint (DE 61 at 1-8).  Nevertheless, the pertinent allegations

from the Second Amended Complaint are summarized below.

In late 2020, Blatt and Goldner met during an MBA program and subsequently decided to

go into business together (DE 66 ¶¶ 17, 18).  On December 7, 2021, Blatt and Goldner executed

an operating agreement for Goldner Blatt Investments, LLC ("GBI"), where they would be equal

members and managers (*id.* ¶ 11).  They started GBI "together to make investments and engage in

related commercial activities 'in the cryptocurrency world'" (*id.* ¶ 18).  Goldner, along with

Defendant Korsen and Defendant Divlov, independently organized The Dharma Initiative, LLC, which services miners for others for a fee (*id.* ¶ 19).  According to Blatt, after he and Goldner decided to create GBI, under the guise of capital contributions, Goldner deceived him into wiring Goldner a total of $422,148.55, which was intended to purchase bitcoin miners and non-fungible tokens ("NFTs") for GBI (*id.* ¶ 13).  Blatt alleges that he provided funds on multiple occasions, as described in further detail below, for Goldner to purchase the miners and NFTs and provide them to GBI (*id.* ¶¶ 13, 14).  Instead of using the money as intended, Blatt claims that Goldner purchased the miners and NFTs and held them for himself or provided them to Dharma, a company in which Blatt states he did not have a financial interest (*id.* ¶¶ 15-16, 88-89).

Between October 2021 and early December 2021, prior to executing the operating agreement for GBI, Blatt claims that Goldner made the following representations (referred to in the Second Amended Complaint as "the Operating Agreement Representations"), which were ultimately false, in WhatsApp messages, in-person, and in a draft of the operating agreement:

a. Goldner was a "freelance spy" for unnamed agencies working on bringing down the hacktivist collective Anonymous, giving him connections in the spy and espionage world that would lead to various safe and legal opportunities for GBI (OA; In Person);
b. Goldner would give GBI a percentage of the revenue generated from his "Mutual Contacts", including those from his spy activities (OA; In Person);
c. the GBI Members would jointly manage GBI and would make all major decisions together (OA; In Person);
d. the GBI Members would title all of GBI's assets in GBI's name for its – and its Members' derivative – benefit, with clearly defined procedures for how and when to sell assets (WhatsApp messages from October 17, 2021 . . .; OA);
e. Blatt would receive equity in Dharma and a so-called "Neuralverse" fund and affiliated projects like a "Neural Institute" (OA; In Person);
f. Goldner had received introductions to, and had resulting meeting prospects with, former White House secretary and hedge fund manager Anthony Scaramucci, Shark Tank Investor Kevin O'Leary, and Russian Oligarch Roman Abramovich, as Goldner stated in a series of WhatsApp messages to Korsen, Divlov, and Blatt beginning on November 24, 2021 and continuing through December 1, 2021 (WhatsApp, the "Abu Dhabi Messages" . . . ; In Person);

g.  Goldner met with Apple co-founder, Steve Wozniak in the UAE, where Wozniak personally asked Goldner to email him about GBI–related opportunities (WhatsApp, the Abu Dhabi Messages);

h.  Goldner had opportunities to raise more than Two Hundred Fifty Million Dollars ($250,000,000.00) for a variety of projects in Abu Dhabi based on alleged meetings and investor interest there after Blatt's departure from Dubai in November 2022, as detailed in a pitch deck ("the GBI Abu Dhabi Deck") he instructed Blatt to create to support Goldner's alleged efforts in Abu Dhabi (WhatsApp, the Abu Dhabi Messages);

i.  Miriam, a TRIUM alumna based in Abu Dhabi had reviewed the GBI Abu Dhabi Deck, and that she and her husband would personally raise money for GBI, with Goldner stating that Miriam could "get us mil for the miners to have our own pool." Goldner further represented that "Miriam's husband is going to raise us the money. X2 of the raise. He thinks he can do 100M" (WhatsApp, the Abu Dhabi Messages);

j.  Clemens, another TRIUM alumnus and Harvard Neurosurgeon, would open a "Neural Institute" for GBI that would offer state-of-the-art medical research facilities in Abu Dhabi for neural interface research and development (WhatsApp, the Abu Dhabi Messages); and

k.  Goldner would forgo law school to commit time to GBI, going so far as to claim that a [sic] potential investors in Dubai asked Goldner "how much I want to postpone law school I said 20 million" (In Person; WhatsApp, the Abu Dhabi Messages).

(*id.* ¶ 24). Goldner purportedly sent Blatt a draft of GBI's operating agreement in early December 2021, which memorialized prior representations Goldner made to Blatt (referred to in the Second Amended Complaint as "the Asset Ownership Representations"), including:

a.  Title to all Company property will remain in the name of the Company. No Member or group of Members will have any ownership interest in Company property in whole or in part even if such property was part of a Capital Contribution by a Member[] . . . ;

b.  the GBI Members were prohibited from commingling GBI's assets with any other persons or entities' assets, accounts, or liabilities . . . ; and

c.  Any investments that the Managing Members make are a 1:1 cash value based on current market prices at the time of assignment and will be certified and memorialized in an email and on WhatsApp to avoid confusion or dispute of that assets value with a screenshot being taken at the time of assignment and attached. All such assignments must be signed over in writing to GBI and approved by both Managing Members unanimously . . . ;

d.  When deciding to purchase an… there will be an agreement VIA email in writing in relation to the time horizon to hold the Investment and the Exit Parameters of such an… and then once the asset, property, and/or investment hits either of those marks then [e]ither partner may force a sale. . . .

(*id.* ¶ 26).  Blatt claims that due to the Operating Agreement Representations and Asset Ownership Representations, he executed GBI's operating agreement on December 7, 2021 (*id.* ¶ 27).

After executing the operating agreement, Blatt alleges that Goldner proposed GBI launch an NFT fund where they would raise money from investors to purchase NFTs (*id.* ¶¶ 28-29). Goldner and Blatt supposedly agreed that GBI would own the NFTs only until the NFT fund had sufficient capital to purchase the NFTs from GBI (*id.* ¶ 32).  According to Blatt, he memorialized his conversation with Goldner in an email, whereby Goldner agreed to assign all the NFTs to GBI (*id.* ¶ 34).  As part of the proposal, Goldner agreed that he would contribute $400,000 worth of NFTs to GBI (*id.* ¶ 36).  Blatt claims that based on the agreement that Goldner would contribute $400,000 of NFTs to GBI, GBI would sell the NFTs to the NFT fund, the email containing Blatt's memorialization of his conversation with Goldner, the Operating Agreement Representations, and the Asset Ownership Representations (referred to in the Second Amended Complaint as "the NFT Representations"), Blatt wired two installments of $100,000 on February 4 and 7, 2022, for a total of $200,000, to Goldner to purchase NFTs for GBI (*id.* ¶ 37).  Blatt alleges that the NFTs were never transferred to GBI, and Goldner purportedly stored the NFTs in his own wallets and commingled the NFTs with others that supposedly belong to Dharma (*id.* ¶¶ 38-42).

In late December 2021, Goldner allegedly approached Blatt about buying bitcoin miners from Compass Mining LLC ("Compass") for GBI, with the intention that GBI would lease them to investors for a profit (*id.* ¶ 44).  Korsen and Divlov participated in a WhatsApp group chat with Blatt and Goldner to discuss topics related to bitcoin mining and supposedly expressed an interest in purchasing miners for themselves (*id.* ¶ 45).  According to Blatt, Goldner claimed that he could purchase miners at a "heavy discount" (*id.* ¶ 46).  However, Blatt contends that Goldner intentionally omitted that Compass only offered him its standard price for the miners and that he

intended to title all miners in Dharma's name (*id.* ¶ 47).  On January 5, 2022, based on Goldner's alleged representations and omissions, Blatt drafted a miner lease and servicing agreement (*id.* ¶ 48).  On March 2, 2022, Blatt, at Goldner's direction, sent Compass two wires, for a total of $131,951 for the "First Bundle Purchase" (*id.* ¶ 53).  Two days later, on March 4, 2022, Blatt wired $20,000 to Goldner to purchase another bundle of miners from Compass (*id.* ¶ 59).  On March 21, 2022, Blatt wired Compass $70,217.55 to purchase more miners (*id.* ¶ 65).  In total, Blatt wired $222,148.55 to purchase miners for Goldner to title to GBI as in-kind contributions by Blatt (*id.* ¶ 66).  Blatt alleges that Goldner used Blatt's money to purchase miners for his and Dharma's benefit and use (*id.* ¶ 70).  According to Blatt, the miners were placed into accounts controlled and managed by Goldner and never became GBI's property (*id.* ¶¶ 71, 73).

In May 2022, the cryptocurrency market began to decline, and Blatt called for GBI to sell the NFTs (*id.* ¶¶ 74, 76).  Goldner allegedly refused on May 6, 2022, saying "sue me, Eli, I'm not selling" (*id.* ¶ 77) (emphasis removed).  Blatt claims that he realized at this point that Goldner misled him and never titled, assigned, or stored the NFTs in GBI's name (*id.* ¶ 79).  Blatt asserts that he and GBI never had access, control, or any visibility over the miners; so, Blatt had no knowledge about the miners' status or how much bitcoin the miners actually mined (*id.* ¶¶ 80-81).  Despite this, Blatt alleges that it was clear that GBI did not own any miners or mined Bitcoin (*id.* ¶ 82).  Dharma supposedly also benefitted from Blatt's funds, "with the GBI Members benefiting derivatively" (*id.* ¶ 84).

Blatt asserts that Goldner's representations, including the Operating Agreement Representations, the Asset Ownership Representations, the NFT Representations, and the Miner Representations (referred to in the Second Amended Complaint collectively as "the

Representations"), upon which Blatt relied when sending money, were false (referred to in the

Second Amended Complaint as "the Falsities") because, among other things, Goldner:

    a. Never made any efforts to, nor did he ever, title any property (including the Assets) in GBI's name or contribute assets of any kind to GBI;

    b. Never made any efforts to, nor did he ever grant equal management rights to Blatt over GBI and its alleged assets, even though doing so would have been trivial;

    c. Never made any efforts to, nor did he ever grant Blatt a financial interest in the Neuralverse project, Dharma, or their "Mutual Contacts";

    d. Never worked as a spy or in espionage, nor did he have the financial opportunities he claimed as a result of such activities;

    e. Never had any direct introductions or meetings with Anthony Scaramucci, Kevin O'Leary, Roman Abramovich, or Steve Wozniak in November 2022;

    f. Lied to Blatt about Miriam (i) reviewing the GBI Abu Dhabi Deck (ii) introducing Goldner to O'Leary, Scaramucci, and Abramovich; and (iii) stating she would help raise money for GBI and get it "at least" a million dollars ($1,000,000.00); all of which Miriam has directly refuted, writing to Blatt "He was just leeching on anyone that could get him intros" and that she "didn't feel comfortable connecting him to people" (WhatsApp, January 7, 2024);

    g. Lied about Clemens telling Goldner he would start a Neural Institute for GBI (WhatsApp, January 5, 2024);

    h. Concealed that the "heavy discount" he had allegedly secured for the Miners was, in fact, Compass' standard Bundle pricing available to any person purchasing a Bundle (WhatsApp, January 12, 2023); and

    i. Goldner resumed his law school studies one year later.

(*id.* ¶ 87). Blatt claims that Goldner knew his representations were false at the time he made them

with the intent of inducing Blatt to enter into the GBI operating agreement and wire funds for

Goldner's and Dharma's benefit (*id.* ¶¶ 86, 88). Blatt also claims that Goldner deliberately

concealed the following material facts related to the operating agreement, assets, and funds

(referred to in the Second Amended Complaint as "the Concealments"):

    a. He never intended to title any of the Assets in GBI's name, as evidenced by Goldner making no effort to secure a cryptocurrency wallet to store NFTs for GBI, instead purchasing NFTs into his own wallets commingled with the Individual Defendants NFTs;

    b. He never intended to make any capital contributions to GBI, nor did he;

    c. The 'heavy discount' on miners Goldner had allegedly secured was in fact Compass' standard Bundle pricing not a special discount;

> d. Goldner and/or Dharma, and not GBI, would in fact own and have access to the Miners, which Goldner knew upon requesting the Invoices from Compass, prior to Blatt wiring the Miner Funds; and that the Representations were false.

(*id.* ¶ 93).

As the Parties' relationship deteriorated, Dharma and its members demanded that Blatt pre-pay Compass's hosting fees for five years (*id.* ¶ 94). Blatt refused and sent a Demand Letter, insisting that Goldner transfer Blatt the miners that were purchased with Blatt's money and that the NFTs be placed in a shared wallet (*id.* ¶ 96). Goldner refused (*id.* ¶ 98). The dispute escalated, and Blatt received a Notice of Default from Divlov, in which he was purportedly portrayed as one of Dharma's members (*id.* ¶ 100). The Notice of Default demanded that Blatt pay $140,512.50 for Dharma's outstanding invoices from Compass (*id.* ¶¶ 101-03). Further, in an email, labeled the "Korsen Correspondence," Korsen allegedly admitted to Blatt that the Dharma members "knew all along" that Dharma would own the miners, instead of GBI (*id.* ¶ 56) (quotation omitted).

In return, on April 30, 2023, Blatt served Goldner with a Recission Notice, seeking to rescind GBI's operating agreement, because of, among other things, Goldner's false and misleading statements and lack of consideration (*id.* ¶¶ 112-13).[3] According to Blatt, on December 31, 2022, "he was to be considered retroactively withdrawn from GBI . . . if a court were to deny the rescission, without waiving his rights to any of the consideration granted to him by the Operating Agreement, and on the assumption that the net asset value was $0" (*id.* ¶ 114). Otherwise, Blatt stated his withdrawal was effective, at the latest, on the date of the Recission

---

[3] The Recission Notice is attached to the Second Amended Complaint as Exhibit I (DE 66-9), which allows the Court to consider it as part of Plaintiff's complaint. *See M.C. Dean, Inc. v. City of Miami Beach, Fla.*, 199 F. Supp. 3d 1349, 1352 (S.D. Fla. 2016) ("In addressing a Rule 12(b)(6) motion, the Court considers the allegations of the complaint, exhibits attached or incorporated by reference, and exhibits attached to the motion to dismiss if they are central to the plaintiff's claim and undisputed." (citation omitted)). GBI's operating agreement is attached to the Second Amended Complaint as Exhibit A (DE 66-1).

Notice – April 30, 2023 (DE 66-9 at 2).  In response to Blatt's Recission Notice, Goldner wrote a June 29, 2023 letter, stating "your attempted withdrawal as of April 30th, 2023 is hereby accepted as of June 29, 2023, and the entire equity, interest, and all assignments are being purchased for $0" (DE 66 ¶ 117).

As a result, Blatt asserts twelve claims in the Second Amended Complaint.  In Count One, Blatt brings a claim for Fraudulent Inducement individually, and derivatively on behalf of GBI, against Goldner and Dharma (*id.* ¶¶ 127-32).  In Count Two, Blatt asserts a claim for Equitable Fraud individually, and derivatively on behalf of GBI, against Goldner and Dharma (*id.* ¶¶ 133-40).  In Count Three, Blatt seeks a Declaratory Judgment individually, and derivatively on behalf of GBI, against Goldner finding that the operating agreement is void and subject to recission, that Goldner is equitably estopped from claiming any rights or remedies and defenses under the operating agreement, and alternatively, clarifying Plaintiff's date of withdrawal and specifying that GBI's net value is $0 (*id.* ¶¶ 141-45).  Blatt asserts a claim of Civil Theft in Count Four individually, and derivatively on behalf of GBI, against Goldner and Dharma (*id.* ¶¶ 146-54).  For Count Five, Blatt brings a claim of Unjust Enrichment for the NFT Funds and the NFTs individually, and derivatively on behalf of GBI, against Goldner (*id.* ¶¶ 155-58).  In Count Six, Blatt asserts a claim of Unjust Enrichment individually, and derivatively on behalf of GBI, for the Miner Funds, Miners, and Mined Bitcoin against Goldner and Dharma (*id.* ¶¶ 159-65).  In Count Seven, Blatt brings a claim of Conversion individually, and derivatively on behalf of GBI, of the NFT Funds against Goldner (*id.* ¶¶ 166-70).  For Count Eight, Blatt asserts Conversion of the Miner Funds, Miners, and Mined Bitcoin individually, and derivatively on behalf of GBI, against Goldner and Dharma (*id.* ¶¶ 171-74).  Blatt asserts a claim of Civil Conspiracy in Count Nine individually, and derivatively on behalf of GBI, against Dharma, Goldner, Korsen, and Divilov

(*id.* ¶¶ 175-90).  In Count Ten, Blatt brings a claim for a Constructive Trust individually, and derivatively on behalf of GBI, against Goldner and Dharma (*id.* ¶¶ 191-96).[4]  Count Eleven seeks a Declaratory Judgment derivatively on behalf of GBI against Goldner and Dharma determining which assets are properly owned by GBI and the resulting value thereof, establishing how much Goldner is liable to GBI, calling for all assets to be transferred to GBI, and stating that Goldner must purchase Plaintiff's interests in GBI at fair market value or appointing a custodian to equitably retrieve, liquidate, and distribute GBI's assets (*id.* ¶¶ 197-207).  For Count Twelve, Blatt individually, and derivatively on behalf of GBI, asserts a claim for Breach of Fiduciary Duties against Goldner (*id.* ¶¶ 208-18).[5]  The Parties previously stipulated, and confirmed at the August 4, 2025 hearing, that Delaware law applies to this action (DE 36 ¶ 1; DE 61 at 8).

**B.**  **The August 21, 2024 Report and Recommendation on Defendants' Motion to Dismiss Plaintiff's Amended Complaint**

On August 21, 2024, the Court issued a Report and Recommendation on Defendants' Motion to Dismiss Plaintiff's Amended Complaint (DE 61).  The Court noted that "the entire

---

[4] Plaintiff attempts to withdraw Count Ten by stating in his opposition, "Plaintiff withdraws Count X, only, without prejudice and reserves the right to file a motion to impose a constructive trust" (DE 76 at 19).  The Federal Rules of Civil Procedure do not permit a Plaintiff to withdraw a claim simply by stating it in an opposition brief.  Nevertheless, since Defendants do not oppose Plaintiff's withdrawal of Count Ten, it is respectfully recommended that the Court construe Plaintiff's statement as a limited motion to amend under Rule 15 and **STRIKE** Count Ten from Plaintiff's Second Amended Complaint.  *See Prime Prop. & Cas. Ins. Inc. v. Joy Cargo Servs. Corp.*, No. 20-CIV-25014, 2021 WL 4991145, at *1 (S.D. Fla. June 16, 2021) (noting Rule 41(a) only permits voluntarily dismissal of an "action" and upon plaintiff's notice of withdrawal of count one, construing plaintiff's notice as a motion to amend and striking count one from the complaint); *Nealy v. Landstar Inway, Inc.*, No. 18-CIV-00478, 2019 WL 13217266, at *1 (S.D. Ala. Nov. 21, 2019) ("A plaintiff wishing to eliminate particular claims or issues from the action should amend the complaint under Rule 15(a) rather than dismiss under Rule 41(a).").  The Court therefore does not address any arguments with respect to Count Ten.

[5] There are only twelve (12) counts in the Second Amended Complaint.  Plaintiff mistakenly labeled the last claim as Count Thirteen, instead of Count Twelve.

Amended Complaint exhibits the characteristics of a shotgun pleading, which should be dismissed" (*id.* at 9).  The Court reasoned that the Amended Complaint reincorporated all 116 factual allegations in each claim, "when that plainly is not the case" (*id.* at 10).  For example, the Court noted that the alleged representations made to induce Plaintiff to enter into the operating agreement could not also be the allegations establishing fraud post-agreement (*id.*).  As another example, the Amended Complaint grouped representations related to the execution of the operating agreement and purchasing of the NFTs and the miners, together as "Representations" (*id.* (citing DE 30 ¶ 90)).  The Court explained that "grouping together the Operating Agreement, Funds, and Assets, the Amended Complaint fails to identify precisely what the consequences of the given misrepresentations were" (*id.* at 23).

For Plaintiff's fraudulent concealment claim, he "incorporate[d] every fact previously pled—including the facts pertaining to the fraudulent representations" (*id.* at 11 (citing DE 30 ¶ 125)).  Further, the Court noticed that Plaintiff cited to the "entire list of Operating Agreement Representations" (*id.*).  Similarly, Plaintiff incorporated every allegation to support his claims for breach of fiduciary duty, equitable fraud, recission, declaratory judgment and constructive trust (*id.* at 11-12).  The Court enlightened Plaintiff that "[u]ltimately, each Count is bogged down with general allegations which, at best fail to provide clarity and, at worst, contradict that which forms the basis for a given Count" (*id.* at 12).

The Court noted that the Amended Complaint was a shotgun pleading and recommended that "the Court dismiss the Amended Complaint with leave to amend" (*id.*).  The Court also provided Plaintiff with instructions: "[A] second amended complaint must include only factual allegations that support each of his claims. The second amended complaint must also clearly, simply, and concisely state which allegations support each claim" (*id.*).  The Court analyzed the

substantive deficiencies raised in Defendants' Motion to Dismiss as failure to redress the shortages "would again warrant dismissal" (*id.*). For example, Plaintiff's unjust enrichment claims for the NFTs, NFT funds, the miners, and the Miner funds comingled Plaintiff's harm with GBI's harm, failing to appreciate that they are separate actors and potential plaintiffs (*id.* at 16).

The Court recommended dismissing Plaintiff's claims against Dharma, Korsen, and Divlov for aiding and abetting a breach of fiduciary duty, as Plaintiff failed to allege "a breach that the Individual Defendants played a substantial role in causing" (*id.* at 20). Likewise, Plaintiff's fraudulent inducement, concealment, and equitable fraud claims all failed to meet the heightened pleading standard under Federal Rule of Civil Procedure 9 (*id.*). The Court specifically pointed to Plaintiff's repeated grouping of allegedly fraudulent representations, described as "ambiguities alleged in the collective," as problematic, because it "fails to identify precisely what the consequences of the given misrepresentations were" while also relying on "superfluous and immaterial allegations" for a particular count (*id.* at 21-23). Plaintiff also failed to allege the time, place, or manner of the representations on which he was relying (*id.* at 22). For each of the fraud claims, the Court reiterated that "[w]ithout specificity regarding the fraud at issue," the claims fall short of Rule 9(b)'s heightened pleading standard (*id.* at 22-23).

The Court adopted the August 21, 2024 Report and Recommendation, finding "no clear error" with the "well-reasoned analysis," and no party objected to the Report and Recommendation (DE 62 at 1-2). As a result, the Amended Complaint was dismissed without prejudice and with leave to amend (*id.*). The Court again provided Plaintiff with clear instructions for an amended complaint:

> [I]nclude only factual allegations that support each of his claims; clearly, simply, and concisely state which allegations support each claim; raise allegations of harm specific enough to enable the Court to determine whether the injury he seeks to redress is his own, or whether Goldner Blatt Investments, LLC's interests make it

> indispensable to this suit; and; allege with sufficient specificity the 'who, what,
> when, where, and how' that form the bases of his fraud claims.

(*id.* ¶ 2(a)-(d)).

### C.    Procedural Posture

On October 10, 2024, Plaintiff filed his Second Amended Complaint (DE 66).    On

November 6, 2024, Defendants filed their Motion for Continuance of Trial Date, Extension of Pre-

Trial Deadline and Amended Scheduling Order (DE 71).    In that Motion, Defendants sought to

extend, among other things, the deadline for joinder of additional parties, asking that the deadline

be set for February 17, 2025 (*id.* at 4).   A day later, Defendants moved to dismiss Plaintiff's Second

Amended Complaint (DE 72).   On November 22, 2024, the Court entered a Scheduling Order

Setting Civil Trial Date and Pretrial Schedule predicated on Defendants' request, setting the

deadline for joinder of any additional parties as February 17, 2025 (DE 75 ¶ 1).

On February 17, 2025, Defendants filed a 217-page Counterclaim and Third-Party

Complaint, adding twelve (12) new parties as Third-Party Defendants (DE 81).[6]   Defendants have

not yet answered the Second Amended Complaint.   Defendants also have not obtained leave of

Court to file a Third-Party Complaint.   In their Supplemental Briefing, Defendants contend that

even though they have yet to answer the Second Amended Complaint, they were required to file

the Counterclaim and Third-Party Complaint due to the November 22, 2024 Scheduling Order that

Defendants requested (DE 165 at 2).

In a related case in this District, Third-Party Defendant MegaCap Capital, LLC filed a

lawsuit on November 7, 2024, against Defendants Marc J. Goldner, Simon Divilov, and Roderyck

Reiter.  *See Megacap Capt., LLC v. Goldner, et al.*, No. 24-CIV-24385-KMM (S.D. Fla. Nov. 7,

---

[6] The Counterclaim and Third-Party Complaint contains 52 exhibits comprised of 1,503 pages (DE
81-1–81-52).

2024).  On January 31, 2025, before the Counterclaim and Third-Party Complaint was filed in this case, the court in the related case dismissed MegaCap Capital's complaint without prejudice, as the parties failed to file their joint scheduling report (*id.*, DE 14).  In that case, no party moved to reopen the case even though the court allowed them to do so (*id.*).

## II.   LEGAL STANDARDS

### A.   Shotgun Pleadings and Dismissal Under Rule 8(a)

"Rule 8(a)(2) requires a complaint to include 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015).  Under Rule 10(b),

> A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence—and each defense other than a denial—must be stated in a separate count or defense.

Fed. R. Civ. P. 10(b).  "Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings.'"  *Weiland*, 792 F.3d at 1320.  The United States Court of Appeals for the Eleventh Circuit has identified four types of shotgun pleadings:

> The most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type . . . is a complaint that does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief. Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against. The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.

*Id.* at 1323.  "A dismissal under Rules 8(a)(2) and 10(b) is appropriate where 'it is *virtually impossible* to know which allegations of fact are intended to support which claim(s) for relief.'" *Id.* at 1325 (emphasis original) (quoting *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)).

"Courts in the Eleventh Circuit have little tolerance for shotgun pleadings." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018).  Indeed, "[t]hey waste scarce judicial resources, 'inexorably broaden the scope of discovery,' 'wreak havoc on appellate court dockets,' and 'undermine the public's respect for the courts.'" *Id.* (cleaned up and citation omitted).  "In dismissing a shotgun complaint for noncompliance with Rule 8(a), a district court must give the plaintiff 'one chance to remedy such deficiencies.'" *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1358 (11th Cir. 2018) (citing *Vibe Micro, Inc.*, 878 F.3d at 1295).  The Eleventh Circuit provides the following guidance for non-compliant pleadings with Rule 8(a):

> When a litigant files a shotgun pleading, is represented by counsel, and fails to request leave to amend, a district court must sua sponte give him one chance to replead before dismissing his case with prejudice on non-merits shotgun pleading grounds. In the repleading order, the district court should explain how the offending pleading violates the shotgun pleading rule so that the party may properly avoid future shotgun pleadings. . . . After that one . . . opportunity to replead comes and goes, . . . the district court [is allowed] to dismiss with prejudice if the party has still neither filed a compliant pleading nor asked for leave to amend.

*Vibe Micro, Inc.*, 878 F.3d at 1296 (citations omitted).  "What matters is function, not form: the key is whether the plaintiff had fair notice of the defects and a meaningful chance to fix them." *Jackson*, 898 F.3d at 1358.

### B.     Motion to Dismiss for Failure to State a Claim under Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To meet this plausibility standard, a plaintiff must "plead [] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678.  On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

Under Rule 9(b), "[f]raud must be pled with particularity." *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007) (citing Fed. R. Civ. P. 9(b)).  A litigant can satisfy Rule 9(b) by pleading the following:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Id.* (citation and quotation omitted).  "While '[a]llegations of date, time or place satisfy the Rule 9(b) requirement that the *circumstances* of the alleged fraud must be pleaded with particularity,' we have acknowledged that 'alternative means are also available to satisfy the rule' in substantiating fraud allegations." *Id.* (emphasis original) (quoting *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1512 (11th Cir. 1988)).  Nevertheless, "[c]ourts should 'hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that [the] plaintiff has substantial prediscovery evidence of those facts.'" *Otto Candies, LLC v. Citigroup*

*Inc.*, 137 F.4th 1158, 1178 (11th Cir. 2025) (citation omitted).  "[U]nder Rule 9(b), it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent."  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).

## III.   <u>DISCUSSION</u>

Defendants assert various arguments for dismissing the Second Amended Complaint with prejudice.  First, Defendants argue that Plaintiff's own allegations demonstrate that he lacks standing to assert any claim on behalf of GBI (DE 72 at 1).  Specifically, Defendants point to paragraph 114 of the Second Amended Complaint, where Plaintiff alleges that he withdrew as a member of GBI (*id.* at 1-2).  Second, Defendants contend that Counts One and Two are inadequately pled, as Plaintiff disregarded the Court's previous instructions that the operative complaint should be clear and concise and failed to meet the heightened pleading standard under Rule 9(b) for fraud claims (*id.* at 6, 8).  Third, Defendants suggest that Counts Three through Eight fail to satisfy Rule 8 as the Second Amended Complaint is a shotgun pleading (*id.* at 9-14).  For the Civil Conspiracy claim in Count Nine, Defendants argue that it lacks specificity and clarity as Plaintiff groups the four Defendants together without providing a concise factual basis for each individual Defendant's conduct (*id.* at 14-15).  Defendants advance a familiar argument for dismissing Counts Eleven and Twelve, claiming Plaintiff unsuccessfully complied with Rule 8 by relying on contradictory and vague allegations and theories (*id.* at 14-20).

Plaintiff counters that the Second Amended Complaint is not a shotgun pleading (DE 76 at 1-3).  Plaintiff proceeds by arguing that if GBI is an indispensable party, it is already joined, and in any event, GBI is not necessary to this action, because both members are already Parties (*id.* at 3-6).  Plaintiff maintains that he has standing to assert claims on GBI's behalf, because his

withdrawal was predicated on certain conditions that have not been met (*id.* at 6-8). Plaintiff suggests that Counts One and Two are sufficiently pled to satisfy the requirements for fraud (*id.* at 8-10). Similarly, Plaintiff takes the position that Counts Three through Eight comply with Rule 8 (*id.* at 10-17). In Plaintiff's view, Count Nine sufficiently states a claim for civil conspiracy by putting each Defendant on notice of his or her role and participation in the conspiracy (*id.* at 17-19). Lastly, Plaintiff disputes that Counts Eleven and Twelve are insufficiently pled, reiterating that Plaintiff is permitted to plead alternative theories of his case (*id.* at 19-21).

### A.    Defendants' Challenge to Plaintiff's Standing to Bring Derivative Claims on Behalf of GBI

At the outset, Defendants argue that the Second Amended Complaint still contravenes the Report and Recommendation, which directed that the allegations should differentiate whether the harm is Plaintiff's or GBI's (DE 72 at 2). To the extent that Plaintiff attempts to bring claims on behalf of GBI, Defendants point out that based on Plaintiff's "own version and admission of withdrawing from [GBI], he cannot act in a representative or derivative capacity of GBI . . ." (*id.* at 1). In particular, Defendants point to paragraph 114 of the Second Amended Complaint, where Plaintiff alleges that he is no longer a member of GBI and "has withdrawn regardless of the rescission date" (*id.* at 2). Because Plaintiff is no longer a member of GBI, Defendants assert that Plaintiff lacks standing to bring claims derivatively on behalf of GBI.

Plaintiff counters that Defendants' argument misconstrues the allegations in the Second Amended Complaint (DE 76 at 6). Plaintiff explains that paragraph 114 states:

> Blatt further stated in the Rescission Notice that *if a court were to deny the rescission*, without waiting [sic] his rights to any of the consideration granted to him by the Agreement, *and on the assumption that the net asset value was $0*, that he was to be considered retroactively withdrawn from GBI.

(*id.* at 6) (quotations omitted).  According to Plaintiff, he "incontrovertibly remains a Member of GBI and accordingly has standing to bring derivative claims" (*id.* at 7).[7]  Plaintiff further claims that even if he did withdraw from GBI, Goldner's assertion that Goldner purchased his interests for $0 without having conducted a GAAP valuation, which Plaintiff claims is required by the operating agreement, is "clearly invalid . . . [and] cannot possibly have been effectuated" (*id.*).

### i.   Whether Plaintiff's Claims Are Direct or Derivative on Behalf of GBI

Defendants' arguments related to whether Blatt has asserted direct or derivative claims on behalf of GBI, whether GBI is an indispensable party to this litigation under Rule 19, and whether Blatt has standing to bring claims derivatively were raised in the prior Motion to Dismiss.  The August 21, 2024 Report and Recommendation began by noting, "There is no question that a corporation is an indispensable party in a derivative action brought by one of its shareholders" (DE 61 at 14 (citing *Liddy v. Urbanek*, 707 F.2d 1222, 1224 (11th Cir. 1983)); *see also Agostino v. Hicks*, 845 A.2d 1110, 1117 (Del. Ch. 2004) ("Although not specified by Rule 23.1, the corporation is an indispensable party to a derivative action.").  The Report and Recommendation then dismissed Defendants' cursory argument that GBI is a necessary party to the breach of fiduciary duty, recission, and declaratory judgment claims, because it consisted of "all of two sentences" (*id.*).[8]  Regarding the unjust enrichment and conversion claims, the Report and Recommendation recognized that Plaintiff pled allegations that show "he has or had an interest in the assets, including his own funds and the purchased NFTs and miners; however, the relationship is not clearly alleged because many, if not most, of his allegations relating to the harm suffered by

---

[7] At the August 4, 2025 hearing, Plaintiff retreated from this position, arguing instead that all claims in the Second Amended Complaint are direct, because the harm is to Blatt, individually.

[8] A recission claim was not included in the Second Amended Complaint.

himself or GBI collapses the two into one, and fails to appreciate that they are separate actors . . . (*id.* at 16).  Indeed, the Court directed, "Plaintiff's allegations of harm should be specific enough to enable the Court to determine whether the injury he seeks to redress is his own, or whether GBI's interests make it indispensable to this suit" (*id.*; *see also* DE 62 at 2).

Armed with the opportunity to amend his pleading, Plaintiff decided to change the caption of the case to read: "ELI M. BLATT, individually and derivatively on behalf of GOLDNER BLATT INVESTMENTS, LLC" and to write under each cause of action "Blatt, individually and derivatively on behalf of GBI," except for Count XI, which is brought solely as a derivative claim on behalf of GBI (*see generally* DE 66).  Beyond these superficial labels, Plaintiff does not point to any new or revised allegations in the Second Amended Complaint that clarify whether Plaintiff is asserting an injury to himself or to GBI.[9]  What is more, though the Court should not have to search through a 41-page pleading for such revisions, upon doing so, it could not locate any such allegations.  Rather, in his opposition, Plaintiff refers to his "joinder of GBI derivatively . . . pursuant to the R&R" (DE 76 at 3).  He goes further still, arguing "no reasonable grounds for dismissal on the basis of GBI being an indispensable party have been asserted, given that it is already a party as a derivative Plaintiff" (*id.* at 4).  At the August 4, 2025 hearing, Plaintiff seemingly acknowledged that simply labeling a claim as derivative does not mean Plaintiff has brought a properly pled derivative action under the Federal Rules of Civil Procedure or Delaware

---

[9] Plaintiff did add conclusory statements, such as "Blatt suffered damages as a direct result of Defendants' actions that are distinct and separate from any harm to GBI or its other member, Goldner, who benefitted from the Funds and Assets" (DE 66 ¶ 122).  But, the Court is not required to accept legal conclusions that are couched as factual allegations on a motion to dismiss.  *See Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*, 26 F.4th 1235, 1240 (11th Cir. 2022) ("Only factual allegations, and not legal conclusions, are relevant to our inquiry, and 'mere conclusory statements . . . do not suffice.'").

law and that GBI is now a party to this action.[10]  Instead, Plaintiff focused his efforts on arguing

that his claims are, in fact, direct claims, not derivative claims on behalf of GBI.

Plaintiff then contends that he "has attempted to sidestep the need to potentially bring his

claims derivatively on behalf of GBI (in the event the court rules some capital contributions were

completed) by way of invoking the *Derouen* exception" – set forth in *Derouen v. Murray*, 604 So.

2d 1086, 1092 (Miss. 1992) (DE 76 at 5).  According to Plaintiff, "the Derouen exception obviates

the need for derivative claims entirely in the case of closely-held companies . . ." (DE 76 at 4).[11]

Putting aside that *Derouen* makes no mention of Delaware law, this Court has only located a

handful of cases that even mention "the *Derouen* exception," all of which arise under Mississippi

law.  Contrary to his assertions, Plaintiff has not provided any legal authority that could lead this

Court to reasonably conclude that Delaware law recognizes "the *Derouen* exception."  *C.f. Gerber*

*v. EPE Holdings, LLC*, No. CIV.A. 3543, 2013 WL 209658, at *12 (Del. Ch. Jan. 18, 2013) ("[T]he

direct-derivative split is a fundamental part of our law, and it is not for a trial court to overlook

established principles.").  Even if the "the *Derouen* exception" was recognized by Delaware law,

Plaintiff has not demonstrated it should be applied to this case.  *See Spiller v. Cherry*, No. 09-CIV-

---

[10] At the August 4, 2025 hearing, Plaintiff candidly conceded that if the claims are derivative, he would have a "pleading issue," that he would have been required to "separate it out," and that he would have to identify whether GBI should be a party to the lawsuit.

[11] In *Derouen*, the Mississippi Supreme Court held:

> In the case of a closely held corporation ..., the court in its discretion may treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, if it finds that to do so will not (i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons.

*Spiller*, 2009 WL 2982953, at *1 (quoting *Derouen*, 604 So. 2d at 1091).

044, 2009 WL 2982953, at *2 (N.D. Miss. Sept. 14, 2009) (declining to apply the *Derouen* exception as "a direct action for individual recovery might interfere with a fair distribution of the recovery among all interested persons" where not all interested parties were brought into the action). Similarly, the other cases Plaintiff discussed are inapposite. *See Raimbeault v. Accurate Mach. & Tool, LLC*, 302 F.R.D. 675, 684 (S.D. Fla. 2014) (finding when litigation involves a contract under which an absent party "has no rights or obligations" even though it "may be impacted" by the litigation, that absent party is not an indispensable party); *In re Shawe & Elting LLC*, No. CIV-10449, 2015 WL 4874733, at *1 (Del. Ch. Aug. 13, 2015) (deciding whether the Court should appoint a custodian to dissolve and sell a company where the members could not run the company together).

After all of this, the Court is still left with the very same issue that was first identified in the Report and Recommendation – based on specific allegations in the Second Amended Complaint, can the Court determine whether the purported harm is to Plaintiff himself or to GBI? As with the last iteration of the complaint, the Court continues to be bogged down with claims that treat Blatt and GBI as if they are interchangeable entities with interchangeable harms and "general allegations, which at best fail to provide clarity and, at worst, contradict that which forms the basis for a given Count" (DE 61 at 12). Plaintiff also recognizes that he is requesting the Court to "allow [him] to bring otherwise traditionally-derivative claims directly . . . , or else rul[e] against Defendants' alleged requirement for Plaintiff to additionally join GBI by naming it as a nominal defendant" (DE 76 at 6). Nevertheless, based on the allegations that have been pled, the Court attempts to determine whether the claims, as set forth in Second Amended Complaint, are direct claims by Blatt under Delaware law.

To determine if a claim is direct or derivative, Delaware courts ask "[w]ho suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy?" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004).  "[T]o prove that a claim is direct, a plaintiff 'must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.'"  *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1260 (Del. 2016) (citation omitted).  "[T]he Court evaluates whether the nature of the alleged injury is such that it falls directly on the LLC as a whole and only secondarily on an individual member as a function of and in proportion to his pro rata investment in the LLC, in which case the claim would be derivative, or whether the injury inflicts direct harm on the rights of the member as an individual."  *Kelly v. Blum*, No. CIV.A. 4516, 2010 WL 629850, at *9 n.63 (Del. Ch. Feb. 24, 2010).  "[T]he reviewing court must look to the body of the complaint and consider the nature of the wrong alleged and the relief requested."  *Culverhouse v. Paulson & Co. Inc.*, 133 A.3d 195, 198 (Del. 2016); *see also Dieterich v. Harrer*, 857 A.2d 1017, 1027 (Del. Ch. 2004) ("Even after *Tooley,* a claim is not 'direct' simply because it is pleaded that way . . . . Instead, the court must look to all the facts of the complaint and determine for itself whether a direct claim exists.").

Turning to the unjust enrichment claims in Counts Five and Six first, Plaintiff alleges, "Goldner was unjustly enriched by Plaintiff by accepting and retaining the benefit of the NFT Funds and, in turn, the NFTs for his own benefit, without providing Blatt or GBI fair value for them by assigning them formally to GBI as per the Miner Representations and managing them in accordance with the Asset Ownership Representations" (DE 66 ¶ 156).  Earlier in the Second Amended Complaint, Plaintiff claims, "The NFTs were to be GBI property subject to the terms of the Asset Ownership Representations, until such time as GBI sold them to the NFT Fund" and that

"Goldner would follow to purchase NFTs for GBI, including, critically, that Goldner would 'assign' all the subject NFTs to GBI" (*id.* ¶¶ 30, 34).  Indeed, the Second Amended Complaint is replete with allegations that Goldner was to use the money sent by Plaintiff to purchase NFTs for GBI, not Plaintiff individually (*see id.* ¶¶ 37, 43, 76, 79).  The only allegations that touch on a direct harm to Blatt, aside from the fact that Blatt provided the money for the purchase of the NFTs for GBI, are the following: (1) "Blatt suffered damages as a direct result of Defendants' actions that are distinct and separate from any harm to GBI or its other member, Goldner, who benefitted from the Funds and Assets"; (2) "There is a relationship between the unjust enrichment of Goldner and Blatt's efforts individually and as Managing Member of GBI"; and (3) "It would be inequitable for Goldner to retain the benefits wilfully [sic] and knowingly retained by him without compensating Plaintiff for the value of the benefit conferred" (*id.* ¶¶ 122, 157, 158).

Likewise, the allegations related to the unjust enrichment for the Miner Funds, Miners, and Mined Bitcoin discuss Plaintiff providing money to buy miners "to be titled by Goldner to GBI as in-kind contributions by Blatt" (*id.* ¶¶ 13, 66).  Plaintiff claims Goldner and Dharma were unjustly enriched by accepting all or some of the money provided by Plaintiff to purchase the miners without providing Plaintiff "fair value therefore" or "with any consideration" (*id.* ¶¶ 160-61).  Plaintiff goes on to state, "As a direct and proximate cause of Dharma and Goldner's unjust enrichment, Plaintiff has suffered damages" (*id.* ¶ 165).

While it is clear that Plaintiff provided the funds for the NFTs and the miners, it is equally clear that he did so as part of his capital contributions to GBI, based on the agreement with Goldner that the NFTs and the miners would be GBI's property.  Under the first prong of *Tooley*, the alleged harm, based on the current muddled allegations, appears to be to GBI.  In other words, when Goldner allegedly used the funds to purchase the NFTs and miners for himself and Dharma, he

misappropriated those assets from GBI. *See Polak v. Kobayashi*, No. 05-CIV-330, 2008 WL 4905519, at *8 (D. Del. Nov. 13, 2008) (explaining that an unjust enrichment claim that the defendant improperly titled 17 acres of land in his own name instead of the LLC's was a derivative claim making the LLC the real party in interest). Moreover, it seems the benefit of the recovery would flow to GBI, and Blatt, if he was a member, would, in turn, receive his share of the recovery. For example, Plaintiff alleges, "Neither Goldner nor Dharma has any justification for retaining the Miner Funds, the Miners purchased therewith, or the Mined Bitcoin without providing Plaintiff adequate compensation" (DE 66 ¶ 163). That allegation, by itself, demonstrates that if the miners that were purchased with Plaintiff's funds were returned to GBI, along with any corresponding Mined Bitcoin, Plaintiff would not be entitled to the entire profits from the miners and the Mined Bitcoin. Plaintiff would be entitled to his *pro rata* share of those assets based on the operating agreement, which indicates a derivative claim. *See El Paso Pipeline GP Co., L.L.C.*, 152 A.3d at 1264 (finding where "the damages would be proportionate to [plaintiff's] ownership interest[, t]he necessity of a *pro rata* recovery to remedy the alleged harm indicates that his claim is derivative"). Notwithstanding Plaintiff's failure to clarify his allegations related to the subject of the alleged injury, considering the allegations that have been pled in the Second Amended Complaint, under the *Tooley* analysis, the Court can only discern derivative claims for unjust enrichment in Counts Five and Six.

The conversion claims in Counts Seven and Eight are similarly derivative claims on behalf of GBI. The factual allegations supporting the conversion claims are nearly identical to those supporting the unjust enrichment claims. Plaintiff simply adds, "Goldner's use, possession, and control of the NFT Funds and the NFTs purchased therewith were taken without justification and to injure Plaintiff, and was inconsistent with Plaintiff's ownership interest in same and was

26

otherwise intended to deprive Plaintiff of his ownership interest in the NFT Funds" (DE 66 ¶ 168). The same allegation is made with respect to the Miner Funds, the Miners, and the Mined Bitcoin (*id.* ¶ 172). Since these claims are based on the same facts as the unjust enrichment claims, for the reasons stated above, the conversion claims in Counts Seven and Eight are also seemingly derivative claims.[12]

Plaintiff alleges a civil conspiracy against Dharma, Goldner, Korsen, and Divlov in Count Nine. Specifically, Plaintiff claims, "Korsen and Divilov wanted to avail themselves of discounted miner Bundle pricing through Dharma but could not individually afford to purchase entire Bundles" (*id.* ¶ 176). So, "Korsen and Divilov conspired with Goldner to use his privileged relationship with Blatt to induce Blatt to wire the Miner Funds for Defendants' benefit" (*id.* ¶ 179). To accomplish this, "[t]he Dharma Members, through explicit agreement and coordinated efforts as Dharma Members, thus conspired to work in concert to induce Plaintiff to wire the Miner Funds to help them secure multiple full Bundles to be owned and controlled by Dharma for the Dharma Members' benefit . . ." (*id.* ¶ 180). "Goldner made the Miner representations . . . unequivocally stating that GBI would own its own Bundles, and that Korsen and Divilov would get no benefit therefrom" (*id.* ¶ 182). "Korsen and Divilov participated in the conspiracy through their willful omission of the fact that they all knew Bundles were not being purchased for GBI . . ." (*id.* ¶ 184). As part of his requested relief, Plaintiff seeks, among other things, "disgorgement of all Miners

---

[12] In Count Four, Plaintiff asserts a claim for Civil Theft, with no citation to any Delaware statute or authority upon which that cause of action is based. It does not appear that Delaware recognizes civil theft as a separate cause of action from conversion. *See Bayuk v. Prisiajniouk*, No. 18-CIV-00163, 2019 WL 4694230, at *4 n.4 (M.D. Fla. Sept. 26, 2019) ("Plaintiff fails to establish that Delaware recognizes a cause of action for civil theft that is in addition to, and materially different from, a claim for conversion"). Further, during the August 4, 2025 hearing, Plaintiff could not provide the Court with any support regarding a claim for civil theft. Thus, it is respectfully recommended that Defendant's Motion to Dismiss Count Four be **GRANTED** and that Count Four be **DISMISSED** for failure to state a cognizable claim.

and bitcoin therewith mined, to be returned to Plaintiff . . ." (*id.* ¶ 190).  As with the preceding

claims, the allegations center around Defendants' alleged conspiracy to misappropriate the NFTs

and the miners that were supposed to be placed in GBI's name.  The allegations from the Second

Amended Complaint establish that the injury is attributable to GBI, as it was supposed to own the

assets that Defendants purportedly conspired to steal.  *See In re First Interstate Bancorp Consol.*

*S'holder Litig.*, 729 A.2d 851, 864 (Del. Ch. 1998) (explaining that claims for aiding and abetting

and conspiracy for breaches of fiduciary duty were derivative claims as the primary liability

belonged to the corporation).  In sum, Count Nine, too, is a derivative claim as pled.

In Count Twelve, Plaintiff alleges that Goldner breached his fiduciary duties, including

good faith, loyalty, and care "owed [to] GBI and Blatt" (DE 66 ¶ 212).  Plaintiff claims the sole

basis for the fiduciary duties Goldner owed to GBI and Blatt is the operating agreement, as

"Delaware law imposes fiduciary obligations . . . upon members of a Delaware limited liability

company and to the Company itself" (*id.* ¶¶ 209-10).  Plaintiff contends that Goldner breached his

fiduciary duties in the following ways:

a.  Making the Representations with actual knowledge of the Falsities and
   Concealments;
b.  Inducing Plaintiff to execute the Operating Agreement and wire the Funds
   under false pretenses;
c.  Making no efforts to honor the Representations thereafter or provide Blatt or
   GBI the benefit of Blatt's Funds;
d.  Titling the Assets in his own and Dharma's name;
e.  Seeking to needlessly have GBI pay Dharma servicing fees;
f.  Demanding that Blatt pay Dharma and Goldner for Miners purchased using
   Blatt's Miner Funds that Goldner represented would belong to GBI;
g.  Intentionally over-valuing the ethereum he allegedly used to purchase the NFTs
   recorded on the GBI Spreadsheet in spite of the Asset Ownership
   Representations;
h.  Abjectly refusing Blatt's – and by extension GBI's – legitimate call to force a
   sale of the NFTs or otherwise have access or manage the Assets; and
i.  Using threats, intimidation, and extortion in his efforts to coerce Blatt into
   dropping his claims on the Assets.

(*id.* ¶ 214).  Additionally, Plaintiff alleges that Goldner had "superior knowledge and access to material information regarding" the NFTs and the miners, and he improperly used that knowledge and his position of trust for his own benefit (*id.* ¶¶ 215-17).

Once again, the Court has before it a series of statements that refer to alleged harms to "Blatt or GBI" or "Blatt[] – and by extension GBI[]" or "Blatt and/or GBI[,]" making it exceedingly difficult for the Court to determine who, or what, was harmed by the alleged breach. Aside from the first two alleged breaches, which are primarily reiterations of Plaintiff's fraud claims in Counts One and Two, the sum of the allegations seems to point to Goldner's failure to provide GBI with the benefit of the funds Blatt provided for the NFTs and the miners.  For example, the NFTs, the Miners, and the Mined Bitcoin were all assets designated to GBI (*id.* ¶¶ 13, 29, 34, 41, 44, 55, 59, 76, 79).  Naturally, these assets were to be controlled "pursuant to the Operating Agreement terms governing GBI asset ownership" (*id.* ¶ 73).  Moreover, the Second Amended Complaint refers to "Goldner as manager of GBI" breaching his fiduciary duties that were established by the operating agreement (*id.* ¶ 134, 147).  Put differently, under *Tooley*, this claim, too, demonstrates that the harm from any alleged breach of fiduciary duties by Goldner flows to GBI.  *See Koloni Reklam, Sanayi, Ticaret LTD/STI v. Viacom, Inc.*, No. 16-CIV-285, 2017 WL 726660, at *4 (D. Del. Feb. 23, 2017) (explaining that a breach of fiduciary duty claim against a company's manager was derivative given that any loss was suffered by the company). As a result, Count Twelve is another derivative claim.

Finally, the Court turns to the declaratory judgment claims in Counts Three and Eleven. As an initial matter, Plaintiff pleads that Count Eleven is "a Derivative Claim on behalf of GBI" and does not plead that it is also brought as a direct claim by Blatt.  With respect to Count Three, Plaintiff seeks a declaration that GBI's operating agreement is void *ab initio* "as the Operating

Agreement is the fruit of Goldner's improper course of conduct in breach of his fiduciary obligations and fraud" (DE 66 ¶¶ 143-44).  Plaintiff seeks the following requested relief, among other things:

> (i) declaring that the Operating Agreement is void and subject to rescission, or else mandating liquidation under 8 Del. C. § 226 and/or dissolution under 6 Del. C. § 18-802; (ii) declaring that Goldner is equitably estopped from claiming any rights, remedies, or defenses under the Operating Agreement; (iii) alternately, clarifying the date of Blatt's withdrawal from GBI and specifying that its Net Asset Value is $0 . . . .

(*id.* ¶ 145).  All the requested relief centers around the recission of the operating agreement and a determination as to the value, if any, of GBI.  As with the other claims, the allegations, and particularly the relief sought, evidence at least in part a harm to GBI.  Moreover, the Second Amended Complaint alleges that the miners and the NFTs were "to be contributed by Goldner to GBI on behalf of Blatt as in-kind contributions" (*id.* ¶ 13).  The operating agreement states, "Title to all Company property will remain in the name of the Company. No Member or group of Members will have any ownership interest in Company property in whole or in part *even if such property was part of a Capital Contribution by a Member*" (DE 66-1 ¶ 74 (emphasis added)).  Any relief seeking a declaration as to GBI's assets, with no corresponding allegations of individualized harm to Blatt, such as a change in his control over the company or a decrease in his interest in the company, indicates a derivative claim.  *See Polak*, 2008 WL 4905519, at *8 (finding where the allegations supporting a claim may allege direct and derivative harm, "the claims' derivative components make them claims for which [the LLC] is a real party in interest").  Based on the allegations in the Second Amended Complaint, Count Three is also brought derivatively.

### ii.    Whether Plaintiff Has Standing to Bring Derivative Claims on Behalf of GBI

Having determined that the allegations in Second Amended Complaint, to the extent they can be deciphered, show Counts Three, Five, Six, Seven, Eight, Nine, Eleven, and Twelve are

derivative under Delaware law, the Court next turns to whether Plaintiff can maintain those claims. "[A] plaintiff, bringing a derivative suit on behalf of a corporation, must be a stockholder of the corporation at the time he commences the suit and must maintain that status throughout the course of the litigation." *Urdan v. WR Cap. Partners, LLC*, No. 2018-CIV-0343, 2019 WL 3891720, at *10 (Del. Ch. Aug. 19, 2019) (citation omitted).  "The obligation of a derivative plaintiff to maintain stockholder status throughout the derivative action has been described as the 'continuous ownership requirement.'"  *Id.* (citation omitted).  "Only LLC members or assignees of LLC interests have derivative standing to sue on behalf of an LLC . . . ." *CML V, LLC v. Bax*, 28 A.3d 1037, 1043 (Del. 2011), *as corrected* (Sept. 6, 2011).

Due to the continuous ownership requirement, Defendants are correct to point out that Plaintiff cannot assert any derivative claims on behalf of GBI.  Attached to the Second Amended Complaint are exhibits that show Plaintiff is no longer a member of GBI.[13]  For instance, Exhibit I is an April 30, 2023 letter from Plaintiff to Goldner where Plaintiff unequivocally states, "I hereby give you notice of my withdrawal [from GBI] as of today" (DE 66-9 at 2).  Additionally, in Plaintiff's own words, he claims that before his April 30, 2023 letter, he previously withdrew as a member of GBI in 2022: "I deem myself to have retroactively voluntarily withdrawn from GBI as of December 31, 2022" (*id.*).  Further, paragraph 114 of the Second Amended Complaint alleges that Plaintiff "was to be considered retroactively withdrawn from GBI as of December 31, 2022" (*id.* ¶ 114).  By Plaintiff's own admissions, he is no longer a member of GBI, and he cannot bring

---

[13] The Court may consider these exhibits at this stage of the litigation. *See Paulino v. W. Funding II Inc.*, 737 F. Supp. 3d 1338, 1348 n.7 (S.D. Fla. 2024) ("A district court can generally consider exhibits attached to a complaint in ruling on a motion to dismiss" (citation and quotation omitted)); *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205 (11th Cir. 2007) ("Under the Federal Rules of Civil Procedure, [] exhibits are part of the pleading 'for all purposes.'" (quoting Fed. R. Civ. P. 10(c))).

any claims on behalf of GBI.  *See Clifford Paper, Inc. v. WPP Invs., LLC*, No. 2020-CIV-0448, 2021 WL 2211694, at *6 (Del. Ch. June 1, 2021) (finding that plaintiff could not assert derivative claims on behalf of a Delaware LLC because it withdrew as a member more than three years ago).

In his opposition, Plaintiff attempts to clarify that his withdrawal was conditioned upon the Court denying the request for rescission of the operating agreement, and on the assumption that the net asset value of GBI was $0 (DE 76 at 6-7).  But, this argument is belied by the actual text of Exhibit I, which makes clear that at the latest, Plaintiff withdrew from GBI on April 30, 2023. *See Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016) ("A district court can generally consider exhibits attached to a complaint in ruling on a motion to dismiss, and if the allegations of the complaint about a particular exhibit conflict with the contents of the exhibit itself, the exhibit controls.").  At the August 4, 2025 hearing, Plaintiff explained that paragraph 43 in the Second Amended Complaint demonstrates that Plaintiff is still a member of GBI.  Paragraph 43 states, "As of today [October 10, 2024], neither GBI nor Blatt (as Manager of GBI) ever had a full accounting of or any access to the NFTs" (DE 66 ¶ 43).  However, this allegation in no way demonstrates that Blatt is presently a member of GBI, such that he has standing to bring a derivative action.  Plaintiff could not direct the Court to any other paragraph or allegation establishing his standing to bring derivative claims.  In any event, "[w]here, as here, a case is at the pleading stage, the plaintiff must "clearly . . . allege facts demonstrating [standing] . . . ." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016).  Plaintiff then argued at the August 4, 2025 hearing, as previously discussed, that his claims are brought directly.  For the reasons stated above, the allegations as pled undermine that argument.[14]  Accordingly, it is

_____

[14] In *Urdan*, the court noted that while the plaintiff characterized its claim for breach of fiduciary duty as direct, and the defendants argued it was derivative, such a characterization was not pivotal. The court stated,

respectfully recommended that Counts Three, Five, Six, Seven, Eight, Nine, Eleven, and Twelve be **DISMISSED WITHOUT PREJUDICE** for lack of standing.[15]

### B.   Defendant's Motion to Dismiss as a Shotgun Pleading Pursuant to Rule 8(a)

Turning to the remaining fraud claims in Counts One and Two, Defendants argue that those claims should be dismissed as part of yet another shotgun pleading that Plaintiff failed to correct, despite the August 21, 2024 Report and Recommendation identifying these deficiencies.   More particularly, for the Fraudulent Indument claim in Count One and the Equitable Fraud claim in Count Two, Defendants argue that Plaintiff ignored the Court's instructions that the Second Amended Complaint must only include the factual allegations for each claim that are stated simply, clearly, and concisely (DE 72 at 6).   Instead, Defendants argue that Plaintiff "double[d] down" and created more ambiguity by grouping "Operating Agreement Representations," "Asset Ownership Representations," "NFT Representations," and "Miner Representations" together and labeling them as "Representations and Concealments" (*id.*).   Defendants contend that "both fraud claims

---

There is no need to parse the derivative-versus-direct distinction because, assuming for the sake of argument that the claim was direct, the plaintiffs lost their ability to assert it when they voluntarily sold their shares. The right to assert [the breach of fiduciary duty claim], like the right to assert the other rights associated with the shares, passed to the buyer. Unless the plaintiffs somehow contracted to retain those rights, they lost their ability to sue.

2019 WL 3891720, at *13.   In this case, as discussed above, Plaintiff alleges that he withdrew from GBI on April 30, 2023, or sometime before.   By voluntarily withdrawing, Plaintiff, too, gave up his rights to assert these claims.

[15] The Court need not address whether GBI is an indispensable party at this juncture, because Plaintiff lacks standing to bring derivative claims on behalf of GBI.   If Plaintiff did have standing to bring derivative claims, as set forth above, GBI would be a necessary party to this action.   The law is well-settled that "like a limited partnership, a limited liability company is a citizen of any state of which a member of the company is a citizen." *Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004).   Meaning, Blatt and GBI would both be citizens of Florida—destroying the Court's diversity jurisdiction.

again reincorporate every factual allegation into each claim . . . which now contain four separate sub lists of representations" and seek dismissal under Rule 8(a) (*id.*).

Plaintiff argues that that Second Amended Complaint is not a shotgun pleading as it "does not even incorporate all general allegations in every count" (DE 76 at 2).  Plaintiff contends that reincorporating the general allegations in multiple counts is allowed, and that even if there are extraneous factual allegations incorporated into the counts, Defendants only need adequate notice of the claims against them, along with the supporting grounds (*id.*).  According to Plaintiff, Defendants' twenty-five-page Motion to Dismiss demonstrates that they are on notice of the claims against them, because the Second Amended Complaint "meticulous[ly]" incorporates only the relevant allegations into each count (*id.* at 3).  Specifically, for the fraud claims in Counts One and Two, Plaintiff argues that each defined term clearly identifies "which allegations are incorporated into it," and "incorporation by reference to defined terms is a necessary practice that has been meticulously implemented, without which the complaint would need to be 100 pages" (*id.* at 8).

The Court noted in the August 21, 2024 Report and Recommendation that "the entire Amended Complaint exhibits the characteristics of a shotgun pleading" (DE 61 at 9).  Each count in the Amended Complaint was "bogged down with general allegations" as Plaintiff reincorporated every allegation into each count even though there was no relation between the allegation and the particular claim (*id.* at 10-12).  Further, by collectively pleading "Representations," Plaintiff forced the Court to parse through the complaint, which the Court was not required to do (*id.* at 11 (citing *Great Fla. Bank v. Countrywide Home Loans, Inc.*, No. 10-CIV-22124, 2011 WL 382588, at *2 (S.D. Fla. Feb. 3, 2011))).  The Court directed Plaintiff, "[A] second amended complaint must include only factual allegations that support each of his claims" while also "clearly, simply, and concisely stat[ing] which allegations support each claim" (*id.* at 12).

The Second Amended Complaint continues to be plagued by the same deficiencies previously observed in the Report and Recommendation.  The fraud claims once again reallege and reincorporate every paragraph that precedes Count One, in total 126 paragraphs (DE 66 ¶¶ 127, 133, 141, 146, 175, 191, 197, 208).  This places the Second Amended Complaint into the second category of shotgun pleadings – it is "replete with conclusory, vague, and immaterial facts not obviously connected to" the fraud claims.  *Weiland*, 792 F.3d at 1322.  As Defendants point out, "[t]hese issues make it virtually impossible for a defendant to frame intelligent affirmative defenses, or otherwise respond to the allegations therein in a meaningful way" (DE 72 at 4-5).  Even at the most basic level, Counts One and Two are only brought against Goldner and Dharma.  By incorporating all introductory 126 paragraphs into these counts, Plaintiffs are purportedly relying on some allegations that describe Korsen's and Divlov's conduct – Defendants who are not the subjects of the counts.  Or take the allegation: "Goldner responded to the Civil Theft Notice with a campaign of felonious written threats and extortion against Blatt and his fiancé, never complying with the demands therein" (DE 66 ¶ 116).  Nowhere in the Second Amended Complaint is there any factual allegation that explains or supports the supposed "campaign of felonious written threats and extortion."

Beyond simply vague and irrelevant statements, reincorporating and realleging nearly all factual allegations is even more problematic.  For instance, for the Fraudulent Inducement claim, by incorporating every allegation in the first 126 paragraphs, Plaintiff's claim appears to be based on allegations of fraud *before* he entered into the operating agreement and allegations of fraud *after* he entered into the agreement when he made the wire transfers to Goldner.  The Court previously noted why this lack of clarity regarding the theory of the fraud, and the relevant allegations supporting that theory, is problematic:

> Taking Count I as an example, the representations Plaintiff alleges induced him to enter *into* the Operating Agreement cannot be those he alleges Goldner made post-agreement, which allegedly induced him to make the challenged wire transfers. Yet, Plaintiff's fraudulent inducement claim (Count I) is premised upon the allegation that '[t]he Representations were material for Blatt to execute the Operating Agreement and ultimately wire the funds.' Plaintiff groups together representations related to execution of the Operating Agreement and provision of funds to purchase the NFTs and the miners, collectively pled as "Representations."

(DE 61 at 10 (emphasis in original) (internal citation omitted)). Plaintiff failed to correct this. *See Jackson*, 898 F.3d at 1358 ("[T]he key is whether the plaintiff had fair notice of the defects and a meaningful chance to fix them. If that chance is afforded and the plaintiff fails to remedy the defects, the district court does not abuse its discretion in dismissing the case with prejudice on shotgun pleading grounds.").

Plaintiff's insistence on incorporating essentially every fact in the Second Amended Complaint leaves the Court and Defendants wondering – what action did Plaintiff take and based on which representations?[16] Was the action entering into the operating agreement? Was the action wiring funds for the NFTs or the miners or both? Was the action something else in the 126 paragraphs incorporated into the fraud claims? To the Report and Recommendation's point, these acts occurred at different points in time when some allegedly fraudulent representations had been made, but others had not. Plaintiff was directed to clarify the supporting facts for these counts, so

---

[16] Under Delaware law, Fraudulent Inducement requires five elements:

> (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.

*Korber Supply Chain US, Inc.*, 2025 WL 485957, at *4 (citation and quotation omitted). "Equitable fraud requires similar elements to common law fraud, except that a 'claimant need not show that the respondent acted knowingly or recklessly—innocent or negligent misrepresentations or omissions suffice.'" *Id.* at *5 (citation omitted).

the Court and Defendants are on notice of what Plaintiff was fraudulently induced to do and which representations allegedly induced Plaintiff to act.  Notably, in his response, Plaintiff seems to concede that he could have made the Second Amended Complaint more concise—and compliant with Rules 8 and 10—but doing so would have taken too much work (*see* DE 76 at 8) ("In the present case, given the myriad fraudulent representations involving the Agreement, NFTs, and Miners, incorporation by reference to defined terms is a necessary practice that has been meticulously implemented, without which the complaint would need to be 100 pages.").

Instead of fixing the problem with his pleading, with the benefit of the Court's prior analysis, Plaintiff did little to dispel the confusion.  As another example, the fraud claims contend that the "Representations" were false because of the "Falsities" (DE 66 ¶¶ 86-87(a)-(i)).  The "Representations" include: (1) the "Operating Agreement Representations," (2) the "Asset Ownership Representations," (3) the "NFT Representations," and (4) the "Miner Representations" (*id.* ¶ 86).  Each of these groupings that comprise the "Representations" are multiple paragraphs of allegations.  The "Operating Agreement Representations" alone total eleven paragraphs of allegations (*id.* ¶ 24(a)-(k)).  The "Falsities" are nine paragraphs of allegations.  It is an unworkable manner of pleading to require the Court to guess which allegations from the paragraphs of "Falsities" connect to specific allegations in a collective grouping of fraudulent "Representations." By pleading allegations in the collective, Plaintiff asks the Court, and Defendants, to sift through the Second Amended Complaint to find the appropriate allegations that support his claims and guess "what the consequences of the given misrepresentations were" (DE 61 at 23).  Once again, the Court is not required to do so.  *See Est. of Bass v. Regions Bank, Inc.*, 947 F.3d 1352, 1358 (11th Cir. 2020) (explaining that courts in the Eleventh Circuit are not required to parse through a shotgun complaint to figure out which allegations support which causes of action).  Plaintiff was

given an opportunity to amend; filing another pleading with the same deficiencies can result in dismissal with prejudice. *See Vibe Micro, Inc.*, 878 F.3d at 1296 (affirming a dismissal with prejudice of a second amended complaint after the court provided the plaintiff with "a veritable instruction manual" on how to fix the shotgun pleading issues, but the plaintiff failed to do so); *Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 732 (11th Cir. 2020) ("[A] district court is required to give a counseled plaintiff only one chance to replead before dismissing a complaint with prejudice on shotgun-pleading grounds.").

Notably, Plaintiff did not entirely ignore the Report and Recommendation's analysis. Plaintiff added substantive information regarding the time, place, and manner of the allegedly fraudulent representations. Sifting through the Second Amended Complaint, Plaintiff sets forth various allegations that in a WhatsApp Message on October 17, 2021, Goldner stated to Plaintiff, "[T]he GBI Members would title all of GBI's assets in GBI's name for its – and its Members' derivative – benefit, with clearly defined procedures for how and when to sell assets" (DE 66 at ¶ 24(d)). According to Plaintiff, Goldner's October 17, 2021 WhatsApp was made "with the intent of inducing Blatt to enter into the GBI Operating Agreement . . . ." (*id.* at ¶ 88). After being induced into the operating agreement, Plaintiff wired "$422,148.55" to Goldner to purchase NFTs and miners as in-kind contribution to GBI (*id.* ¶ 13). Plaintiff claims that Goldner's October 17, 2021 WhatsApp message was false, because Goldner "never made any efforts to, nor did he ever, title any property (including the Assets) in GBI's name or contribute assets of any kind to GBI" (*id.* ¶ 87(a)). A careful parsing of the Second Amended Complaint reveals that there could be sufficient substance to state a claim for fraud.

Even still, a well-reasoned Eleventh Circuit concurring opinion has cautioned district courts against falling into the trap of scouring unartfully-drafted shotgun complaints on their own

to piece together allegations that state a claim when a Plaintiff, who is represented by counsel, has failed to do so.

> [D]istrict courts are flatly forbidden from scouring shotgun complaints to craft a potentially viable claim for a plaintiff. By digging through a complaint in search of a valid claim, the courts "would give the appearance of lawyering for one side of the controversy." This, in turn, would cast doubt on the impartiality of the judiciary. Such a result is plainly inconsistent with the oath to which each judge has sworn. Lawyers simply cannot delegate the responsibility of making their case to the district courts.

*Barmapov v. Amuial*, 986 F.3d 1321, 1328 (11th Cir. 2021) (Tjoflat, J., concurring) (citations omitted). The concurrence goes on to recognize that "even the potentially viable claims contained in [a Plaintiff's] Second Amended Complaint must be dismissed" in an impermissible shotgun pleading. *Id.* at 1332. In *Barmapov*, the Eleventh Circuit affirmed the district court's dismissal of the plaintiff's second amended complaint, which is the same type of shotgun pleading at issue in this case, after being given an opportunity to amend. *Id.* at 1325. The concurring opinion provided guidance that is certainly applicable here:

> Rather than rectifying the problems in the First Amended Complaint, [Plaintiff's] counsel filed a meandering Second Amended Complaint filled with irrelevant facts and conclusory allegations. The District Court simply could not be expected to expend its limited resources to wade through hundreds of paragraphs of superfluous material in an effort to dig up a viable claim. In fact, had the Court done so, it would have impermissibly given 'the appearance of lawyering' for [Plaintiff].

*Id.* at 1332 (citation omitted).

To put it succinctly, here lies the problem: the Second Amended Complaint brings fraud counts that rely on 126 paragraphs, which reference a plethora of acts and statements that supposedly comprise the alleged fraud, presented through confusing grouping techniques that make it virtually impossible to understand exactly what conduct constitutes the basis of the claim. Plaintiff's puzzling grouping technique leads to a pleading that alleges "the Operating Agreement Representations, Asset Ownership Representations, NFT Representations, and Miner

Representations (collectively, the 'Representations')" were "false because" of "the 'Falsities,'" another grouping of allegations (DE 66 ¶¶ 86, 87(a)-(i)).  It also leads to a pleading that references alleged misrepresentations that occurred before and after Plaintiff was purportedly fraudulently induced to act, depending on what "the act" is, of course, which the pleading does not clearly state. Not to mention, the Second Amended Complaint incorporates vague and conclusory allegations unsupported by any factual content and incorporates allegations against Defendants who are not subject to the claim.  The Court will not put Plaintiff's allegations into an intelligible theory—that is Plaintiff's and Plaintiff's counsel's job.

In conclusion, it is respectfully recommended that Defendants' Motion to Dismiss (DE 72) be **GRANTED**.  It is further respectfully recommended that Counts One and Two be **DISMISSED WITH PREJUDICE** for failure to comply with Rule 8(a) in light of the fact that the Court previously identified the prior Amended Complaint as a shotgun pleading and directed Plaintiff to correct the specified deficiencies.  Plaintiff, through counsel, failed to do so.  It is further respectfully recommended that Counts Three, Five, Six, Seven, Eight, Nine, Eleven, and Twelve be **DISMISSED WITHOUT PREJUDICE** for Plaintiff's lack of standing.  It is further respectfully recommended that Count Four be **DISMISSED WITH PREJUDICE** for failure to state a cognizable claim.  It is further respectfully recommended that Count Ten be **STRICKEN** from the Second Amended Complaint due to Plaintiff's request to withdraw the claim.

## IV.   THE COUNTERCLAIM AND THIRD-PARTY COMPLAINT

On February 17, 2025, Defendants Goldner, Korsen, Divilov, and Dharma filed their Counterclaims against Plaintiff and a Third-Party Complaint adding twelve Third-Party Defendants – MegaCap Funds, LP, MegaCap Funds, LP Tech Holding, MegaCap Funds, LP Tech I, Little Prince Equity, LLC, Thibaut Denonain, Michael Elkins, Wayaca, LLC, Flow, Inc.,

BitSource, LLC, JPMorgan Chase & Co., and Bank of America Corporation (DE 81). Defendants

contend that their Counterclaim and Third-Party Complaint arises from Plaintiff allegedly:

> [I]mproperly and unilaterally remov[ing] Mr. Goldner from many of their jointly
> owned businesses, specifically the various 'MegaCap' related entities and
> BitSource, LLC ("BitSource"), while leaving Mr. Goldner with the businesses,
> Goldner Blatt Investments, LLC ("GBI"), Goldner Blatt Funds, LP ("GBF" or "The
> NFT Fund") and The Dharma Initiative, LLC ("Dharma"), that were all severely in
> debt and with effectively worthless assets at the time.

 (*id.* ¶ 6). Defendants also claim that Plaintiff dispossessed Goldner of his equity and interest in

various MegaCap entities (*id.* ¶ 7). As to the Third-Party Defendants, Defendants allege that they

"either, actively aided and/or abetted Mr. Blatt; had a duty to stop Mr. Blatt but failed to do so; are

entities owned by Mr. Blatt with obligations towards Defendants; or, breached their fiduciary

duties towards [Goldner], amongst other related causes of action" (*id.* ¶ 8).

Defendants assert the following claims in their Counterclaim and Third-Party Complaint:

(1) Goldner brings a breach of contract claim against Plaintiff for the MegaCap February 2023

Resolutions, (2) Goldner brings a breach of contract claim against Plaintiff for the MegaCap

operating agreement, (3) Goldner asserts a breach of contract claim against Plaintiff for the

MegaCap Memorandum of Understanding, (4) Goldner brings a breach of contract claim against

Plaintiff for the GBI operating agreement, (5) Dharma asserts a breach of contract claim against

Plaintiff for the GBI operating agreement, (6) Goldner asserts a breach of contract claim against

Plaintiff for Non-Payment of the NFTs, (7) Goldner brings a claim for breach of fiduciary duties

against Plaintiff under the MegaCap operating agreement, (8) Goldner asserts a breach of fiduciary

duties claim against Plaintiff under the GBI operating agreement, (9) Goldner asserts a fraudulent

misrepresentation claim against Plaintiff, (10) Goldner brings a claim of fraudulent inducement

against Plaintiff, (11) Goldner asserts a fraud claim against Plaintiff, (12) Goldner brings a claim

of conversion against Plaintiff, (13) Goldner asserts a defamation claim against Plaintiff, (14)

Divilov asserts a fraudulent misrepresentation claim against Plaintiff, (15) Goldner brings a claim for misappropriation of trade secrets against Plaintiff, (16) Goldner asserts a claim for a constructive trust against MegaCap Capital, LLC., MegaCap Funds, LP., MegaCap Funds, LP – Tech Holding, MegaCap Funds, LP – Tech I, (17) Goldner asserts a claim for an accounting against MegaCap Capital, LLC., MegaCap Funds, LP., MegaCap Funds, LP – Tech Holding, MegaCap Funds, LP – Tech I, and all MegaCap Related SPVs, (18) Goldner asserts a declaratory judgment claim against Plaintiff and all the MegaCap entities relating to Subscription agreements, MegaCap control, and ownership interests after Goldner's illegal and invalid withdrawal, (19) Goldner asserts a breach of fiduciary duty claim against Plaintiff under the Bitsource, LLC operating agreement, (20), Goldner brings a declaratory judgment claim against Bitsource, LLC, (21) Goldner asserts a tortious interference with a contractual relationship claim against Little Prince Equity, LLC and Thibaut Denonain, (22) Goldner brings a claim for declaratory relief against Little Prince Equity, LLC, (23) Goldner brings a claim for aiding and abetting breach of fiduciary duty against Michael Elkins, (24) Goldner asserts that Michael Elkins aided and abetted fraud, (25) Goldner asserts that Michael Elkins tortiously interfered with a contractual relationship, (26) in the alternative, Goldner claims that Wayaca, LLC, was unjustly enriched, (27) Goldner asserts a breach of contract claim against Wayaca, LLC, relating to the Dragonfire and Mythic and James Bond, (28) Goldner asserts that First Republic Bank and JP Morgan Chase breached their fiduciary duties, (29) Goldner brings a negligence claim against First Republic Bank and JP Morgan Chase, (30) Goldner contends that Flow, Inc. breached its fiduciary duties, (31) Goldner brings an aiding and abetting breach of fiduciary duties claim against Flow, Inc., (32) Goldner asserts that Flow, Inc. committed fraud, (33) Goldner asserts negligence against Bank of America, and (34) Goldner claims that Bank of America breached its fiduciary duties (*id.* ¶¶ 1000-1425).

Plaintiff and all Third-Party Defendants subsequently filed Motions to Dismiss between March and May 2025 (DE 98, 99, 117, 118, 119, 126, 143, 147, 182).  Defendants opposed each motion, and the moving party replied.  After a status conference held on May 21, 2025, the Court permitted the Parties to file supplemental briefing, addressing whether it is proper to have a stand-alone counterclaim that is not attached to an answer and the Court's subject matter jurisdiction over the claims in the Counterclaim and Third-Party Complaint (DE 159, 165, 166, 167, 168, 169).

On March 10, 2025, Plaintiff filed a Motion to Strike Pursuant to Federal Rule of Civil Procedure 12(f), requesting the Court strike various paragraphs and exhibits from the Counterclaim and Third-Party Complaint as immaterial, impertinent, and scandalous, which Defendants opposed (DE 92, 94).  Two days later, on March 12, 2025, Goldner filed a Motion for a Temporary Restraining Order and Preliminary Injunction Barring Sale of Partnership Interests or Other Disposition of Assets (DE 93).  Goldner contends that Plaintiff is unilaterally distributing assets held by MegaCap Capital LLC and its affiliated entities, including but not limited to MegaCap Funds, LP, MegaCap Funds, LP – Tech Holding, MegaCap Funds, LP – Tech (*id.* at 2).  Goldner seeks a restraining order and injunction to prevent Plaintiff and the MegaCap Capital LLC Third Party Defendants from selling, transferring, or disposing of assets of various companies, in which Goldner claims he has an interest, among a wide array of other relief (*id.* at 16-18).

## A.    The Third-Party Complaint Cannot Survive if the Second Amended Complaint is Dismissed

"Rule 14(a) [of the Federal Rules of Civil Procedure] allows a defendant to assert a claim against any person not a party to the main action only if that third person's liability on that claim is in some way dependent upon the outcome of the main claim." *United States v. Olavarrieta*, 812 F.2d 640, 643 (11th Cir. 1987) (per curiam).  "The crucial characteristic of a Rule 14 claim is that defendant is attempting to transfer to the third-party defendant the liability asserted against

defendant by the original plaintiff." *Ryder Truck Rental, Inc. v. Logistics Res. Sols., Inc.*, No. 21-CIV-21573, 2022 WL 2657272, at *13 (S.D. Fla. Feb. 28, 2022); *see also Produce Pay, Inc. v. Agrosale, Inc.*, 533 F. Supp. 3d 1140, 1144 (S.D. Fla. 2021) ("[T]he nonparty must be either liable or potentially liable for all or part of the claim against the defendant."). "Impleader, or third party practice, is only available when the third party defendant's liability is secondary to, or a derivative of, the original defendant's liability on the original plaintiff's claim." *Faser v. Sears, Roebuck & Co.*, 674 F.2d 856, 860 (11th Cir. 1982) (citation omitted). "Rule 14(a) does not allow a third-party complaint to be founded on a defendant's independent cause of action against a third-party defendant, even though arising out of the same occurrence underlying plaintiff's claim, because a third-party complaint must be founded on a third party's actual or potential liability to the defendant for all or part of the plaintiff's claim against the defendant." *Am. Zurich Ins. Co. v. Cooper Tire & Rubber Co.*, 512 F.3d 800, 805 (6th Cir. 2008) (citing *Olavarrieta*, 812 F.2d at 643). "In other words, if the defendant has no liability to the plaintiff, then the third party defendant has no liability to the defendant-third party plaintiff." *Faser*, 674 F.2d at 860.

In this case, it has been recommended that Plaintiff's Second Amended Complaint be dismissed in its entirety for the reasons set forth above. If Plaintiff does not have any remaining viable claims, then there can be no basis for third-party liability under Rule 14(a). As the Third-Party Defendants correctly pointed out, dismissal of Plaintiff's claims automatically extinguishes a Third-Party Complaint that rests on derivative liability. S*ee Faser*, 674 F.2d at 860 (finding where summary judgment was granted in defendant's favor, third-party complaints should have been dismissed); *Houston Granite & Marble v. LMP Trucking, LLC*, No. 19-CIV-04938, 2022 WL 3104857, at *4 (S.D. Tex. Aug. 4, 2022) (dismissing a defendant's third-party complaint without prejudice where "no live claims remain in the main action"); *Procraft Cabinetry, Inc. v.*

*Sweet Home Kitchen & Bath, Inc.*, 348 F. Supp. 3d 752, 764 (M.D. Tenn. 2018) ("When the claims against the defendant are dismissed, no party can be liable to that defendant so there is no ground for a third-party claim.").  Therefore, the Third-Party Complaint cannot stand on its own.

As an attempt to salvage the Third-Party Complaint, in their supplemental briefing, Defendants argue that the claims against the Third-Party Defendants, with the exception of Little Prince Equity, LLC and Thibaut Denonain, who have already been dismissed from this action, "arise from the same core nucleus of facts involving the fraud, breach of fiduciary duties, and mismanagement at the heart of this dispute . . . .  [T]he causes of action against the additional parties do not stem from indemnification related liability but are viable causes of actions stemming from the same core nucleus of facts" (DE 165 at 6-7).  In other words, according to Defendants, Rules 19 and 20 govern the addition of the remaining Third-Party Defendants, not Rule 14 (*id.* at 4 (citing Fed. R. Civ. P. 13(h))).  But Defendants' reliance on Rules 19 and 20 for permissive and required joinder for the proprietary of the Third-Party Complaint is misplaced.

A simple review of the Third-Party Complaint itself shows that the Third-Party Defendants were not added to Counterclaims against Plaintiff but instead, are the subject of new and distinct claims by Defendants, either collectively or individually.  For instance, Defendants actually label themselves as "Counterclaim Plaintiff" in the Counterclaims against Blatt (*see* DE 81 ¶¶ 1000, 1015, 1030, 1038, 1054, 1065, 1072, *et seq.*).  When Defendants bring claims against the Third-Party Defendants, they label themselves "Third-Party Plaintiff," remove Blatt from the cause of action, and plead the cause of action as a Third-Party claim (*see id.* ¶¶ 1244, 1254, 1280, 1323, 1329, 1374, 1405, *et seq.*).[17]  As a result, despite Defendants' efforts to distance their Third-Party

---

[17] Only in Counts Eighteen and Nineteen do Defendants raise any claims against Blatt and a Third-Party Defendant, and those claims are for a declaratory judgement and breach of fiduciary duties involving entities Goldner and Blatt both allegedly participated in (DE 81 ¶ 1216, 1234).

Complaint from the strictures of impleader, Rule 14 governs their ability to add the Third-Party Defendants to this action. *See Daselina Invs. Ltd. v. Finskiy*, No. 19-CIV-24038, 2020 WL 5514198, at *2 (S.D. Fla. June 15, 2020) (rejecting the very same argument by defendant that Rules 19 and 20 govern his attempt to bring claims against a third-party defendant and finding Rule 14 "allows a defendant to assert a claim against any person not a party to the main action only if that third person's liability on that claim is in some way dependent upon the outcome of the main claim" (citation omitted)). As described above, Defendants' ability to sustain the claims against the Third-Party Defendants is cut off by the dismissal of the Second Amended Complaint.[18] Accordingly, it is respectfully recommended that all claims in the Third-Party Complaint against Third-Party Defendants be **DISMISSED WITHOUT PREJUDICE**. It is further respectfully recommended that Third-Party Defendants' Motions to Dismiss (DE 98, 117, 118, 119, 126, 143, 147, 182) be **DENIED WITHOUT PREJUDICE** as moot.

### B. The Counterclaims Should Be Stricken

Notwithstanding the dismissal of the Third-Party Complaint, Defendants also bring several Counterclaims against Plaintiff. Plaintiff filed two Motions to Dismiss Defendants' Counterclaims, arguing that Defendants cannot state claims upon which relief can be granted and cannot file a stand-alone Counterclaim that is not attached to a pleading (DE 99, 159).[19] In their supplemental briefing, Defendants argue that their Counterclaims should proceed, because there

---

[18] Third-Party Defendants also argue that Defendants did not properly implead the Third-Party Defendants under Rule 14, because "Rule 14(a) does not allow the defendant to assert a separate and independent claim even though the claim arises out of the same general set of facts as the main claim." *Olavarrieta*, 812 F.2d at 643. The Court need not reach the issue of whether the Third-Party Complaint was improper under Rule 14(a), because in any event, the Third-Party Complaint must be dismissed with the Second Amended Complaint.

[19] Although Plaintiff filed a separate Motion to Dismiss on May 28, 2025 (DE 159), this filing is properly considered a supplemental brief following the May 21, 2025 status conference, where the Court permitted the Parties to file supplemental briefing.

is complete diversity between Plaintiff and Defendants, establishing the Court's subject matter jurisdiction (DE 165 at 4-7).  Defendants further argue that the Counterclaims were brought in the Third-Party Complaint in compliance with the Court's Scheduling Order (*id.* at 2-4).

The Counterclaim and Third-Party Complaint contains 1,425 paragraphs of allegations; yet, not one of those allegations states the basis for the Court's subject matter jurisdiction or sets forth the citizenship of the Parties to plead diversity (*see generally* DE 81); *see also Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994) ("If jurisdiction is based on either [federal question or diversity grounds], the pleader must affirmatively allege facts demonstrating the existence of jurisdiction and include 'a short and plain statement of the grounds upon which the court's jurisdiction depends.'" (quoting Fed. R. Civ. P. 8(a))).  In their supplemental briefing, Defendants contend, "The Court has independent subject matter jurisdiction as the parties are diverse and the amount in controversy exceeds $75,000 in every claim" (DE 165 at 6).[20]  Without pointing to any specific allegations of citizenship in the Counterclaim, because there are none, Defendants have not met their burden of establishing the Court's subject matter jurisdiction on the face of the Counterclaim. *See Camper & Nicholsons Int'l, Ltd. v. Blonder Marine & Charter, Inc.*, 793 F.

---

[20] Defendants also claim federal question jurisdiction, as "Count XV of the Counterclaim for 'Misappropriation of Trade Secrets under the Trade Secrets Act' against Mr. Blatt" states a federal question (DE 165 at 6).  With no statutory citations of any kind in the Counterclaims, Defendants offer no explanation as to how the Court would determine this is a federal cause action, as opposed to, for example, a cause of action for misappropriation of trade secrets under the Delaware Uniform Trade Secrets Act.  *See Yeiser Rsch. & Dev. LLC v. Teknor Apex Co.*, 281 F. Supp. 3d 1021, 1043 (S.D. Cal. 2017) (describing the elements of a misappropriation of trade secrets claim under the Delaware Uniform Trade Secrets Act).  "The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Cleaver v. Depena*, No. 21-CIV-157, 2021 WL 6137313, at *3 (N.D. Fla. Nov. 22, 2021), *report and recommendation adopted,* No. 21-CIV-157, 2021 WL 6135932 (N.D. Fla. Dec. 29, 2021) (citing *Caterpillar Inc. v. Williams,* 482 U.S. 386, 391 (1987)).

Supp. 318, 319 (S.D. Fla. 1992) ("When a federal court's jurisdiction is premised upon the diversity of citizenship between the parties, the plaintiff bears the obligation of demonstrating in the complaint that complete diversity of citizenship exists between the parties."); *Plant Food Sys., Inc. v. Foliar Nutrients, Inc.*, No. 11-CV-1880, 2012 WL 5387701, at *10 (M.D. Fla. Oct. 3, 2012), *report and recommendation adopted,* No. 11-CV-1880, 2012 WL 5387983 (M.D. Fla. Nov. 2, 2012) ("[T]he person seeking to invoke federal jurisdiction has the burden to demonstrate that the court has subject matter jurisdiction.").[21]

Even if Defendants had sufficiently set forth the basis for the Court's diversity jurisdiction, the Counterclaims should be stricken for failure to comply with the Federal Rules of Civil Procedure. "Ordinarily, a party must assert a counterclaim in its pleadings." *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1259 n.14 (11th Cir. 2003), *aff'd sub nom. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005). There are seven types of pleadings:

> (1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer.

Fed. R. Civ. P. 7(a); *see also Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1336 (11th Cir. 2014) (discussing the seven types of pleadings under the Federal Rules of Civil Procedure). "'Because a counterclaim is not itself a pleading, to state a counterclaim consistently with Rule 7(a) and Rule 13, a party must file the counterclaim *as part of* a recognized pleading, i.e. an answer.'" *ITL Int'l, Inc. v. Walton & Post, Inc.*, No. 10-CIV-22096, 2011 WL 13055064, at *1 (S.D. Fla. June 6, 2011)

---

[21] To the extent Defendants argue that the Third-Party Defendants were joined to Goldner's counterclaims under Rules 19 and 20, not through impleader under Rule 14, despite how the claims are actually pled, Defendants' failure to allege subject matter jurisdiction in the Counterclaims is even more problematic. With the addition of up to twelve more Parties, the Court cannot possibly determine if there is complete diversity, and thus an independent basis of jurisdiction, without the citizenship of the Parties properly pled.

(quoting *Allied Med. Assoc. v. State Farm Mut. Auto. Ins. Co.*, No. 08-CIV-2434, 2009 WL 839063 (E.D. Pa. 2009) (emphasis original)).   The Counterclaims in this case are divorced from any pleading, as required by the Rules.   Defendants argue that the Counterclaims were filed with the Third-Party Complaint, which is a pleading under Rule 7(a).   But, as discussed above, the Third-Party Complaint cannot survive without the Second Amended Complaint; they both are subject to dismissal.   Therefore, Defendants' Counterclaims are untethered to any pleading.

Plaintiff's reliance on *ITL International, Inc. v. Walton & Post, Inc.*, 2011 WL 13055064, is instructive.   In *ITL International, Inc.*, the plaintiffs filed a first amended complaint for declaratory and injunctive relief, breach of contract, and other claims.   *Id.* at *1.   The defendant moved to dismiss, and on the same day, filed a counterclaim.   *Id.*   The court dismissed the amended complaint on international comity grounds.   *Id.*   On appeal, the Eleventh Circuit dismissed the appeal for lack of jurisdiction as the district court "did not dispose of Defendant's counterclaim." *Id.*   The plaintiffs renewed their motions to dismiss the counterclaim and argued, among other things, that it was a procedural nullity.   *Id.*   The court reasoned that Federal Rule of Civil Procedure 13(a) explains, "'A pleading must state as a counterclaim."   *Id.* (quoting Fed. R. Civ. P. 13(a)). "Because a counterclaim is not itself a pleading, to state a counterclaim consistently with Rule 7(a) and Rule 13, a party must file the counterclaim *as part of* a recognized pleading, i.e. an answer."   *Id.* (emphasis original) (citation and quotation omitted).   The court noted that the defendant's counterclaim stood alone, as it "ha[d] not answered the Amended Complaint."   *Id.*   As a result, the court explained that it "must dismiss the counterclaim as a procedural nullity," and did so without prejudice.[22]   *Id.* at *1-2.   Here, too, Defendants have not filed an Answer to the

---

[22] The court in *ITL International, Inc.* noted that the defendant was not without a forum to pursue its counterclaim.   *See ITL Int'l, Inc.*, 2011 WL 13055064, at *2 ("Defendant will not be able to file

Second Amended Complaint but instead filed a Motion to Dismiss (DE 72).   As in *ITL International, Inc.*, Defendants' Counterclaims cannot proceed without a pleading recognized in Rule 7(a).

Moreover, Courts in this Circuit routinely strike standalone counterclaims.   *See e.g.*, *Mobley v. Safeco Ins. Co. of Illinois*, No. 12-CIV-70, 2012 WL 12916444, at *1 (M.D. Fla. Apr. 12, 2012) (striking a counterclaim from the docket as the defendant filed a motion to dismiss the complaint, and at the same time, filed a counterclaim); *Optimal Logistics, LLC v. AG Plus Express, LLC*, No. 18-CIV-2224, 2019 WL 13248329, at *2 (M.D. Fla. Oct. 21, 2019) (striking a standalone counterclaim as "Defendants have filed a motion to dismiss and not an answer, so the stand-alone counterclaims are not permitted and will be stricken."); *Sevi v. Israel Disc. Bank of New York*, No. 13-CIV-21922, 2014 WL 12861831, at *2 (S.D. Fla. July 8, 2014), *report and recommendation adopted*, No. 13-CIV-21922, 2014 WL 12861832 (S.D. Fla. July 28, 2014) (explaining that a stand-alone counterclaim filed before an answer while a motion to dismiss was pending "is simply not permissible"); *Am. Sec. Ins. Co. v. Cazeau*, No. 20-CIV-62607, 2021 WL 6750534, at *2 (S.D. Fla. Apr. 26, 2021) ("Here, Respondent has not answered the Petition, and thus, the Counterclaim is procedurally deficient. Consequently, the Counterclaim is dismissed."); *see also Active Packet, LLC v. Netgen, Inc.*, No. 19-CIV-421, 2020 WL 9073330, at *1 n.1 (M.D. Fla. May 12, 2020) ("The filing of a counterclaim as a stand-alone pleading apart from one's answer is not permitted." "Instead, a defendant's answers, affirmative defenses and any counterclaims must be presented in a single, integrated pleading." (citation omitted)).

---

its counterclaim in this action. Rather, if Defendant wishes to reassert its claims against Plaintiffs it shall do so in a new action.").

In their supplemental briefing, Defendants rely on *Panama City Beach Condos Limited Parntership v. Adjusters International Colorado, Inc.*, No. 08-CIV-369, 2008 WL 11340312 (N.D. Fla. Oct. 14, 2008), which is distinguishable from the numerous courts described above.   In *Panama City Beach Condos*, the plaintiff brought an action for a declaratory judgment, while the defendant moved to dismiss and filed a counterclaim.  *Id.* at *1.  The court accepted that it was unclear if a defendant could file a counterclaim before filing an answer.  *Id.*  Despite citing authority that the counterclaim was improper, the court "assume[d]" that it was properly filed and explained that it made little difference as the defendant would eventually file an answer.  *Id.*  The court also stated that diversity jurisdiction established subject matter jurisdiction for the counterclaim.  *Id.* at *2.   As a result, the court allowed the stand-alone counterclaim.  *Id.* at *3. To the contrary, in this case, no Answer will be forthcoming based on the dismissal of the Second Amended Complaint (*see generally* DE 81).  Not only is *Panama City Beach Condos* distinct, but it is contrary to the weight of authority in this Circuit that rejects the filing of a stand-alone counterclaim.  Therefore, it is respectfully recommended that Defendants' Counterclaims (DE 81) be **STRICKEN**.  It is further respectfully recommended that Plaintiff's Motions to Dismiss (DE 99, 159) be **DENIED WITHOUT PREJUDICE** as moot.  It is further respectfully recommended that Plaintiff's Motion to Strike Portion of Counterclaim (DE 92) be **DENIED WITHOUT PREJUDICE** as moot.

### C.    Defendants' Motion for a Temporary Restraining Order and Preliminary Injunction Should Be Denied Without Prejudice

In his motion for injunctive relief, Goldner contends that on May 5, 2023, Blatt issued an unauthorized withdrawal notice and effectively locked Goldner "out of key business systems, including MCC's Google Workspace, bank accounts, and fund administration portal at Flow" (DE 93 at 9).  As a result of the lockout, Goldner has been excluded from participating in MegaCap's

governance and oversight (*id.*).  Goldner claims that he was demoted from a Class A voting member to a Class B non-voting member by Blatt (*id.* at 11).  Class A Members purportedly received 8,217 shares of derivative equity in [TECH] (*id.* at 9-10).  Plaintiff counters that the withdrawal of Goldner as a Class A voting member on January 17, 2023 was legitimate and executed in strict compliance with MegaCap's operating agreement (DE 108 at 10).  Given that Goldner was no longer a Class A voting member, he purportedly "did not have managerial authority of MegaCap in any capacity" (*id.*).  Plaintiff asserts that Goldner was never entitled to any shares as he was not a Class A voting member and that Goldner fails to provide evidence that he has rights to the same shares as Class A voting members (*id.* at 12).  Additionally, Plaintiff contends that Goldner has presented no evidence to support his claim that Plaintiff is dispossessing Goldner of his shares as a Class A voting member (*id.* at 13).

In support of his argument that he will suffer irreparable harm, Goldner argues that Plaintiff's withdrawal of capital from the MegaCap Third Party Defendants allows Plaintiff to "misappropriate the cash equivalent to the 8,217 shares of [TECH]"[23] (DE 93 at 13).  Plaintiff insists that Goldner's delay in seeking injunctive relief cautions against a finding of irreparable harm (DE 108 at 15).  Goldner reasons that the balance of harms weighs in his favor as he only seeks to "maintain the status quo" by "preventing Mr. Blatt from improperly dissipating and depleting assets and unilaterally selling partnership interests to other investors" (DE 93 at 14).  Plaintiff contends that an injunction would "inflict actual, immediate and catastrophic harm on the Company and innocent third parties" (DE 108 at 15).  Goldner maintains that an injunction will serve the public interest because it will prevent Plaintiff "from causing further strain on judicial

---

[23] The MegaCap Third Party Defendants are defined in Goldner's Motion for Preliminary Injunction as MegaCap Capital LLC, MegaCap Funds, LP, MegaCap Funds, LP – Tech Holding, MegaCap Funds, LP – Tech I (DE 93 at 2).

resources" (DE 93 at 15).  Plaintiff rebuts that an injunction is against the public's interest as it would freeze MegaCap's operations and undermine broader investor confidence in the "operational stability of private funds in the face of General Partner disputes" (DE 108 at 18).

"[A]ny motion or suit for either a preliminary or permanent injunction must be based upon a cause of action, such as a constitutional violation, a trespass, or a nuisance. There is no such thing as a suit for a traditional injunction in the abstract." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005) (citation and quotation omitted).  "For a traditional injunction to be even theoretically available, a plaintiff must be able to articulate a basis for relief that would withstand scrutiny under Fed. R. Civ. P. 12(b)(6) (failure to state a claim)." *Id.* (citation and quotation omitted).  To establish entitlement to a preliminary injunction, a party must show: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the 'public interest.'" *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018) (quoting *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002)).  "The burden of persuasion in all of the four requirements is at all times upon the plaintiff." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (citation omitted).  "If the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002) (citation omitted).

Goldner's Motion for a Temporary Restraining Order and Preliminary Injunction should be denied without prejudice.  As discussed above, the Counterclaims should be stricken, so there is no cause of action that forms the basis for Goldner's Motion.  *See Organo Gold Int'l, Inc. v. Aussie Rules Marine Servs., Ltd.*, 416 F. Supp. 3d 1369, 1379 (S.D. Fla. 2019) (explaining that the

plaintiff may not proceed on an independent claim for injunctive relief); *Congregation 3401 Prairie Bais Yeshaya D'Kerestir, Inc. v. City of Miami Beach*, No. 22-CIV-21213, 2023 WL 11822208, at *6 (S.D. Fla. Mar. 7, 2023) ("Defendant's request for injunctive relief is a remedy and is not properly brought as a standalone claim"); *Blue Water Innovations, LLC v. Fettig*, No. 18-CIV-60671, 2019 WL 1904589, at *2 (S.D. Fla. Mar. 8, 2019) (finding there must be "'independent legal rights' that serve as a basis for the injunctive relief sought"). Without a cause of action, the Court cannot consider if Goldner has a substantial likelihood of success on the merits. *See Baney Corp. v. Agilysys NV, LLC*, 773 F. Supp. 2d 593, 610 (D. Md. 2011) (denying the defendant's motion for a preliminary injunction as there was no counterclaim to allow the court to determine if the defendant was likely to succeed on the merits). Accordingly, it is respectfully recommended that Goldner's Motion for a Temporary Restraining Order and Preliminary Injunction (DE 93) be **DENIED WITHOUT PREJUDICE**.

### V.   <u>CONCLUSION</u>

Based on the foregoing, it is respectfully recommended that Defendants' Motion to Dismiss the Second Amended Complaint (DE 72) be **GRANTED.**  Counts One and Two of the Second Amended Complaint should be **DISMISSED WITH PREJUDICE** for failure to comply with Rule 8(a).  It is further respectfully recommended that Counts Three, Five, Six, Seven, Eight, Nine, Eleven, and Twelve should be dismissed **WITHOUT PREJUDICE** for lack of standing.  It is further respectfully recommended that Count Four be dismissed **WITH PREJUDICE** for failure to state a cognizable claim.  It is further respectfully recommended that Count Ten be **STRICKEN**.

It is further respectfully recommended that all claims against the Third-Party Defendants in the Third-Party Complaint be **DISMISSED WITHOUT PREJUDICE**.  It is further

respectfully recommended that Third-Party Defendants' Motions to Dismiss (DE 98, 117, 118, 119, 126, 143, 147, 182) be **DENIED WITHOUT PREJUDICE** as moot.

It is further respectfully recommended that Defendants' Counterclaims (DE 81) be **STRICKEN**. It is further respectfully recommended that Plaintiff's Motions to Dismiss (DE 99, 159) be **DENIED WITHOUT PREJUDICE** as moot. It is further respectfully recommended that Plaintiff's Motion to Strike Portion of Counterclaim (DE 92) be **DENIED WITHOUT PREJUDICE** as moot.

It is further respectfully recommended that Defendant Goldner's Motion for a Temporary Restraining Order and Preliminary Injunction (DE 93) be **DENIED WITHOUT PREJUDICE**. Lastly, it is respectfully recommended that this case be **CLOSED**.

## VI.   **OBJECTIONS**

The Parties will have **ten (10) days** from this Report and Recommendations to file written objections, if any, with the Honorable Darrin P. Gayles, United States District Judge.[24] Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in this Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report, except upon grounds of plain error, if

---

[24] The undersigned has shortened the objection period to ten (10) days pursuant to Local Magistrate Judge Rule 4(b), as the Parties have thoroughly addressed the issues through extensive briefing and lengthy oral argument.

necessary, in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

      **RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida on this 20th day of August, 2025.

_____
ELLEN F. D'ANGELO
UNITED STATES MAGISTRATE JUDGE

cc: All Counsel of Record

56